**Louis E. COOPER**

v.

**GULF BREEZE HOSPITAL, INC.**

**Civ. A. No. 93–30507 LAC.**

United States District Court,
N.D. Florida.

Nov. 30, 1993.

James H. Tipler, Ft. Walton Beach, FL, for plaintiff.

J. Nixon Daniel, Beggs, Lane, Pensacola, FL, for defendant.

## ORDER DENYING MOTION TO DISMISS

COLLIER, District Judge.

Defendant Gulf Breeze Hospital moves the Court for an order dismissing this action pursuant to Rule 12(b)(6) for failure to state

a claim upon which relief can be granted (doc. 4). Plaintiff Louis Cooper opposes this motion and in turn moves the Court to impose Rule 11 sanctions on Defendant (doc. 6). For reasons explained below, both motions are DENIED.

### Factual Background

In the early morning hours of 29 September 1991, Plaintiff awoke in his home suffering from slurred speech, disequilibrium and an inability to swallow. Plaintiff was transported by ambulance to Defendant's Emergency Department in Gulf Breeze, Florida. He arrived at approximately 2:30 a.m. that morning.[1] Upon admittance, emergency department personnel gave Plaintiff a screening examination. The attending doctor determined Plaintiff needed a CAT scan, but the hospital's equipment was out of order. Doctors accordingly sent Plaintiff to an outside laboratory where a CAT scan was performed at 1:00 p.m. that same day. In light of the CAT scan results, the attending doctor determined Plaintiff had suffered a mild stroke.

When Plaintiff's wife completed the admitting papers, she disclosed Plaintiff did not have medical liability insurance. At this time, Plaintiff and Defendant arranged for an installment plan to permit Plaintiff to pay Defendant's forthcoming invoices. On 30 September 1991, Defendant discharged Plaintiff from the hospital and told him to see his heart doctor in Dothan, Alabama. Defendant also stated it was not necessary to transport Plaintiff by ambulance. At the time of his discharge, Plaintiff was unable to walk and could neither stand nor sit in a wheelchair without collapsing to the right. Plaintiff's wife had to hold him in place while an attendant wheeled Plaintiff from the hospital to his car for the trip to Dothan.

On 3 October 1991, Plaintiff went to the Emergency Room of the Southeast Alabama Medical Center in Dothan. At that time, Plaintiff was admitted and diagnosed as suffering from an acutely evolving embolic stroke. Plaintiff received immediate treatment and began physical therapy for recovery. Plaintiff complains he suffered paralysis of his right side and could not move his toes or speak clearly.

On 29 September 1993, Plaintiff filed the instant action under 42 U.S.C. § 1395dd—the Emergency Medical Treatment and Active Labor Act (EMTALA). Plaintiff claims Defendant is liable for discharging him on 30 September 1991 without having first stabilized his condition. Plaintiff further contends that because of this discharge, his condition materially deteriorated and he suffered personal harm. Defendant moves to dismiss this complaint.

### Analysis

Defendant advances two arguments for dismissal under Rule 12(b)(6). First, Plaintiff has not complied with the pre-suit procedures of Florida Statutes Chapter 766 governing medical malpractice actions. Second, Plaintiff has failed to allege Defendant discharged him for economic reasons. The Court concludes both of these arguments are meritless and therefore the motion to dismiss must be denied.

A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty "that the plaintiff can prove no set of facts that would entitle him to relief." *Milburn v. United States,* 734 F.2d 762, 765 (11th Cir.1984). This requires the Court to accept the allegations in the complaint as true and draw any necessary inferences in a light most favorable to the plaintiff. *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 702 (11th Cir.1985).

The EMTALA is a relatively new statute enacted as part of the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA). Congress drafted this law in response to a nationwide problem of hospitals "dumping" indigent patients who have no health insurance on other medical facilities. *See* H.R. No. 99–241, 99th Congress, 2d Sess. 27–28,

---

1. Plaintiff's complaint in paragraph 5 states Plaintiff arrived at the Emergency room at "2:30 a.m., July 29, 1993." Given the dates cited in paragraphs 4 and 11—stating the time period of these events being late September and early October 1991—the Court assumes the date given in paragraph five is a typographical error.

*reprinted in* 1986 U.S.C.C.A.N. 579, 605–606. To combat this practice, the EMTALA imposes two duties on hospitals[2]. First, when "any individual" comes to a hospital's emergency department requesting examination and treatment for a medical condition, "the hospital must provide for an appropriate medical screening examination." 42 U.S.C.A. § 1395dd(a) (West 1993). Second, a hospital must treat, within its capacity, any individual so as to "stabilize" their condition or arrange for a transfer of the individual to another medical facility. *Id.* at § 1395dd(b)(1). Except under certain circumstances[3], a hospital may not transfer an individual unless their condition has stabilized. *Id.* at § 1395dd(c)(1). If a hospital violates these provisions, the EMTALA allows an injured party to "obtain those damages available for personal injury under the law of the State in which the hospital is located." *Id.* at § 1395dd(d)(2)(A).

■ While this statute creates a private cause of action under federal law, the "patient dumping" provisions of the EMTALA were not intended to supplant state medical malpractice remedies. *See Collins v. DePaul Hosp.*, 963 F.2d 303, 307 (10th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991). Instead, courts interpreting § 1395dd have noted the statute limits private actions to two situations: (1) when the hospital fails to "appropriately" screen an individual, and (2) when the hospital releases or transfers an individual without first stabilizing their condition. *Power v. Arlington Hosp.*, 800 F.Supp. 1384,

1388 (E.D.Va.1992); *DeBerry v. Sherman Hosp. Ass'n*, 741 F.Supp. 1302, 1305 (N.D.Ill. 1990); *see Huckaby v. East Alabama Medical Center*, 830 F.Supp. 1399, 1401–02 (M.D.Ala.1993). Here, Plaintiff has alleged Defendant violated the statute by discharging him without first stabilizing his condition.

■ Defendant initially challenges the complaint arguing Plaintiff has not complied with the pre-suit procedures of Florida's medical malpractice statute. Defendant contends compliance with these procedures is necessary to determine the amount the EMTALA permits Plaintiff to recover under "state law" in this case. *See* 42 U.S.C.A. § 1395dd(d)(2)(A). The issue thus presented is whether § 1395dd(d)(2)(A) incorporates state law regulating medical malpractice suits.[4] From the briefs and the Court's own research, this appears to be a question of first impression in the Eleventh Circuit.

Florida, like many other states, has enacted a statute specifying pre-suit procedures for medical malpractice actions and placing limits on the amount plaintiffs may recover in damages. *See* Fla.Stat.Ann. § 766.101 et seq. (West 1993). Certain provisions in this chapter are purely procedural—such as the requirement that a plaintiff conduct a pre-suit investigation. *See id.* at §§ 766.203. Other provisions, however, place substantive caps on the amount a plaintiff can recover in an action. *See id.* at §§ 766.207, .209. Under Florida's scheme, the damage limits are contingent[5] on what pre-suit procedures the

---

**2.** The provisions of § 1395 are only enforceable against "participating hospitals." *See* 42 U.S.C.A. § 1395dd(d) (West 1993). In essence, this limits the EMTALA's provisions to hospitals receiving medicare funds. *See Power v. Arlington Hosp. Co.*, 800 F.Supp. 1384, 1388 (E.D.Va. 1992).

**3.** § 1395dd permits a hospital to transfer or discharge a patient whose condition has not stabilized when:

(1) the patient requests the transfer in writing after being informed of the hospital's obligations under § 1395dd; or

(2) a physician certifies that based upon information available at the time of the transfer, the medical benefits of treatment at another facility outweigh the increased risks to the individual (and, in the case of labor, the unborn baby); and

(3) the transfer is an "appropriate transfer" under the standards of § 1395dd(c)(2).
42 U.S.C.A. § 1395dd(c)(1).

**4.** § 1395dd(d)(2)(A) provides:

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**5.** For example, Florida's medical malpractice statute allows either a potential plaintiff or defendant to offer to arbitrate the amount of damages in a malpractice action rather than have this issue go to trial. Fla.Stat.Ann. § 766.206 (West

parties follow. *See id.* Thus, according to Defendant, to determine the limit on Plaintiff's recovery under the EMTALA, he must first follow the pre-suit procedures of Florida's medical malpractice statute.

■ Defendant, however, has misconstrued the nature of the EMTALA action and its incorporation of state law. As noted above, the EMTALA was not intended to create a new federal cause of action for medical malpractice. Instead, the statute provides a cause of action for two narrowly-defined situations when a hospital has "dumped" a patient. The EMTALA and state medical malpractice laws provide distinct remedies for different wrongs. *See Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 681 (10th Cir.1991); *Stevison v. Enid Health Systems, Inc.,* 920 F.2d 710, 713 (10th Cir.1990); *Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1133 (6th Cir.1990).

This distinction is borne out in the plain language of the statute. The EMTALA permits individuals to "obtain those damages available for *personal injury* under the law of the State in which the hospital is located...." 42 U.S.C.A. § 1395dd(d)(2)(A) (West 1993) (emphasis added). While this provision expressly adopts state law limits on personal injury claims, it does not specifically incorporate limits on medical malpractice actions. Thus, the plain language of § 1395dd does not support Defendant's position.

In support of its argument that § 1395dd(d)(2)(A) incorporates state limits on medical malpractice actions, Defendant cites *Reid v. Indianapolis Osteopathic Medical Hosp.,* 709 F.Supp. 853 (S.D.Ind.1989). In *Reid,* the court noted the legislative history of § 1395dd is silent on the issue of whether the phrase "those damages available for personal injury under the law of the state" included state limitations on malpractice actions. *Reid,* 709 F.Supp. at 855. In rejecting the argument § 1395dd(d)(2)(A) does not incorporate these limits, the *Reid*

court reasoned Congress was aware of state law limits on malpractice actions and therefore "apparently" intended to preserve these restrictions in the EMTALA. *Id.* Accordingly, the court held the plaintiff's claim was subject to Indiana's damage cap on medical malpractice actions. *Id.* at 855–56. *See also Lee by Wetzel v. Alleghany Regional Hosp. Co.,* 778 F.Supp. 900 (W.D.Va.1991) (following *Reid* and holding § 1395dd incorporates Virginia's statutory cap on damages in medical malpractice actions).

While *Reid* represents one approach to this issue, it is not the only court to have ruled on this question. In a well-reasoned opinion, the court in *Power v. Arlington Hosp.,* 800 F.Supp. 1384 (E.D.Va.1992) expressly declined to follow *Reid* and held against incorporating state limits on medical malpractice damages into § 1395dd(d)(2)(A)[6]. *Power,* 800 F.Supp. at 1387–1391. The *Power* court noted the plain language of § 1395dd(d)(2)(A) incorporated state law on "personal injury"—not state law on "personal injury and medical malpractice." *Id.* at 1388–89. The court then criticized *Reid*'s assumption that Congress intended to incorporate state medical malpractice limits:

> [I]t is probably true that Congress knew of the existence of medical malpractice caps. But it does not follow simply from this that Congress intended to incorporate those caps in EMTALA. Indeed, the opposite inference is more plausible because it is more consistent with the statue's plain language and its purpose.

*Id.* 800 F.Supp. at 1390.

As the *Power* court correctly emphasized, medical malpractice actions are separate and distinct from EMTALA actions. *Id.* Malpractice actions are based on negligence and seek to compensate victims for injuries suffered when health care providers breach the applicable standard of care. As noted earlier, the EMTALA targets the evil of "patient dumping" and is not based on fault. The

---

1993). If the potential plaintiff refuses to arbitrate, then their recovery for noneconomic damages at trial is capped at $350,000 per incident of malpractice. *Id.* at § 766.209.

**6.** Both the *Reid* and *Power* courts were interpreting 42 U.S.C. § 1395dd(d)(3)(A). While the 1990 amendments to the EMTALA redesignated this provision as subsection (d)(2)(A), its language remained unchanged.

EMTALA narrowly defines the sanctionable conduct and holds hospitals alone liable. Thus, EMTALA and malpractice actions focus on different conduct and seek different goals. *Id.* Given these distinctions, it is improper to assume, as the *Reid* court did, that § 1395dd(d)(2)(A) incorporates state law damage limits on medical malpractice actions. *Id.*

At the same time, *Reid* in one aspect supports finding Plaintiff does *not* have to comply with the pre-suit procedures of Florida's medical malpractice statute. While the *Reid* court held the EMTALA incorporated Indiana's cap on damages, it declined to hold the EMTALA also incorporated Indiana's procedural requirement that malpractice plaintiffs present their claims to a "medical review panel" before filing suit. *Reid,* 709 F.Supp. at 855. The court reasoned that conditioning a federal cause of action with state procedural requirements was an "extraordinary step" not supported by the language of § 1395dd. *See id.* at 854–55.

■ As noted above, Florida's statute conditions damage caps on the pre-suit procedures followed by the parties. In this regard, Florida's malpractice scheme differs from the limits at issue in *Power* and *Reid* because the limits in those cases where not inextricably tied to pre-trial procedures. *See Reid,* 709 F.Supp. at 854; *Power,* 800 F.Supp. at 1387 n. 7. Given the *Reid* court's unequivocal holding that § 1395dd does not incorporate state procedural requirements, it is unclear whether *Reid* supports incorporating Florida's damage limits when this would mandate bringing in the Florida's pre-suit procedures as well. Thus, the Court concludes § 1395dd(d)(2)(A) does not incorporate Florida's medical malpractice law and therefore this argument does not support dismissal of this action.

■ As a second basis for dismissal, Defendant contends Plaintiff has failed to allege Defendant discharged him for economic reasons. Citing *Evitt v. University Heights Hospital,* 727 F.Supp. 495 (S.D.Ind.1989), Defendant posits that § 1395dd only prevents hospitals from discharging individuals for economic reasons—i.e., lack of insurance or inability to pay. Because Plaintiff has failed to allege he was discharged for economic reasons, Defendant argues he has failed to state a claim for relief under the EMTALA.

In *Evitt,* the court noted the EMTALA targeted "patient dumping" and reasoned the statute was "specifically directed toward preventing prospective patients from being turned away for economic reasons." *Evitt,* 727 F.Supp. at 497 (citing *Reid,* 709 F.Supp. at 853). The *Evitt* court also cited the EMTALA's ability to pre-empt state malpractice laws and concluded Congress intended to limit the Act's application so as not to preempt state statutes in an area traditionally governed by state law. *Id.* Accordingly, the *Evitt* court reasoned a plaintiff must show he was denied screening or transferred from a hospital for economic reasons in order to recover under the EMTALA. *Id.* at 498; *see also Stewart v. Myrick,* 731 F.Supp. 433 (D.Kan.1990) (citing *Evitt* and dismissing complaint brought under EMTALA for plaintiff's failure to allege hospital discharged decedent for economic reasons).

Again, there is no precedent in this circuit bearing on this issue. Moreover, as was the case with Defendant's first argument for dismissal, there are divergent views among the courts that have addressed this point. While *Evitt* presents one viewpoint, the Court concludes the better-reasoned view is that of the district court in *DeBerry v. Sherman Hospital Ass'n,* 741 F.Supp. 1302 (N.D.Ill.1990) and the Sixth Circuit in *Cleland v. Bronson Health Care Group,* 917 F.2d 266 (6th Cir. 1990).

■ In *DeBerry,* the court held § 1395dd does not require a person to be released or transferred for economic reasons in order to have a claim under the EMTALA. *DeBerry,* 741 F.Supp. at 1307. The *DeBerry* court properly reasoned that although the EMTALA may have been motivated by "patient dumping," the plain language of the statue does not limit the cause of action to those who have been released for economic reasons. *Id.* at 1306. The duties imposed by § 1395dd(a) on hospitals apply when "any individual" seeks examination and treatment. 42 U.S.C.A. § 1395dd(a) (West 1993). No-

where does the statute mention either indigency, inability to pay or a hospital's motive as prerequisites to statutory coverage. *See id.; DeBerry,* 741 F.Supp. at 1306. Thus, while Congress may have been motivated by the plight of indigent persons, they did not limit recovery under the EMTALA to cases where hospitals discharged people based on financial considerations. *See DeBerry,* 741 F.Supp. 1306; *Collins v. DePaul Hosp.,* 963 F.2d 303, 308 (10th Cir.1992).

The *DeBerry* court also criticized *Evitt*'s reliance on the potential preemptive effect the EMTALA on state malpractice law. *Id.* 791 F.Supp. at 1307. Rather than broadly preempting state law on medical malpractice, § 1395dd(f) states "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." As explained in *DeBerry,* this provision prevents § 1395dd from preempting most state law on malpractice. *Id.* Instead, it will only preempt state law to the extent it directly conflicts with the EMTALA. 42 U.S.C.A. § 1395dd(f) (West 1993). Given the EMTALA's narrow definition of duties and actionable wrongs, it is unlikely the Act will significantly invade the province of state medical malpractice law. The *Evitt* court's conclusion, based on a misperception of the EMTALA's preemptive effect, that Congress limited the EMTALA to cases where a patient is discharged for economic reasons is misplaced. *Id.*

In sum, the Court concludes neither of Defendant's arguments support dismissal of this complaint. Rather, the Plaintiff has stated a cause of action under the EMTALA. As noted earlier, § 1395dd imposes liability on a hospital in two situations: where the hospital fails to screen a person and when a hospital releases a patient without stabilizing their condition. 42 U.S.C.A. § 1395dd(a), (b) (West 1993). Here, in paragraph 14 of his complaint, Plaintiff alleges Defendant violated the EMTALA by "failing to stabilize Plaintiff's medical condition" before releasing him. This is sufficient to state a claim under this statute. Thus, Defendant's motion to dismiss must be denied.

At the same time, Plaintiff's motion to impose Rule 11 sanctions must also be denied. Contrary to Plaintiff's assertion, Defendant's motion was supported by a reasonable interpretation of existing caselaw. In this regard, Plaintiff has not violated the provisions of Rule 11 by filing this motion.

### Summary

Defendant's motion to dismiss (doc. 4) is DENIED. Plaintiff's motion to impose Rule 11 sanctions (doc. 6) is also DENIED.

ORDERED.