[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 10 2001
THOMAS K. KAHN
CLERK

_____

No. 99-13205

_____

D.C. Docket No. 99-00786-CV-KMM

BERNIE HARRY, as Personal Representative of
the Estate of Lisa Normil, deceased,

Plaintiff-Appellant,

versus

WAYNE MARCHANT, M.D.,
ALI BAZZI, M.D., et al,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 10, 2001)**

Before BARKETT and WILSON, Circuit Judges, and GEORGE[*], District Judge.

BARKETT, Circuit Judge:

_____

[*] Honorable Lloyd D. George, U.S. District Judge for the District of Nevada, sitting by designation.

Bernie Harry, as Personal Representative of the Estate of Lisa Normil, appeals the dismissal of his amended complaint against Wayne Marchant M.D., Ali Bazzi M.D., Christopher Hanner M.D., Kevin Coy M.D., Polly Linker R.N., and Miami Beach Healthcare Group, Ltd., d/b/a Aventura Hospital and Medical Center ("Aventura"), alleging violations of 42 U.S.C. § 1395dd (Emergency Medical Treatment and Active Labor Act or "EMTALA") and 42 U.S.C. § 1981 that contributed to and/or caused the death of Lisa Normil.

## BACKGROUND

The complaint in this case alleges the following facts. Lisa Normil was brought to the Aventura Hospital emergency room on November 26, 1997, at approximately 1:17 a.m., by Miami-Dade Fire Rescue and medical treatment was requested on her behalf. She was seen in the emergency room by Dr. Marchant, who diagnosed Normil as suffering from pneumonia and possible sepsis or pulmonary embolism. Marchant contacted Dr. Coy, the on-call attending physician, to report Normil's diagnosis and to request permission to admit her to the intensive care unit ("ICU"). Coy did not immediately authorize Normil's admission, but instead directed Marchant to obtain a ventilation perfusion scan ("VQ scan"). The VQ scan was not performed, allegedly because Aventura had run out of the isotopes necessary to perform the scan. Despite Aventura's inability to perform the VQ scan, Marchant did not arrange to have Normil

2

transferred to another facility. Marchant also contacted Dr. Bazzi, Normil's primary care physician, but Bazzi did not see Normil until approximately five hours later, still in the emergency room. Subsequently, Normil was admitted to the ICU. By that time, Normil had been in the emergency department for more than seven hours.

Although antibiotics had been prescribed, Normil did not receive any while in the ICU. Sometime after her admission to the ICU, Normil lapsed into respiratory and cardiac failure. Dr. Hanner, another emergency department physician, allegedly responded to the "Code Blue" announcement in an untimely manner and failed to properly manage the resuscitation efforts. The attempted resuscitation was unsuccessful, and Normil died in the ICU on November 27, 1997.

Harry filed suit against the defendants, alleging that they had caused and/or contributed to Normil's death. Harry alleged that Aventura had violated EMTALA, by failing to provide Normil with an appropriate screening to determine whether she suffered from an emergency medical condition and by failing to stabilize and treat her condition. He further alleged, pursuant to 42 U.S.C. § 1981, that Aventura, Linker, and Bazzi violated Normil's civil rights by infringing on her right to contract for medical services.[1] The defendants moved to dismiss, and the district court dismissed

_____

[1] The remainder of the complaint consisted of state law claims for wrongful death against all of the defendants, a claim for negligence per se against Aventura, and a claim for vicarious liability against Aventura. Drs. Marchant and Coy were sued under state law only.

with prejudice the claims brought under EMTALA and § 1981.[2]  This appeal followed.

**DISCUSSION**

On appeal, Harry asserts that the district court erroneously ruled that his amended complaint failed to state a cause of action for violation of EMTALA, 42 U.S.C. § 1395dd(a) and (b) and 42 U.S.C. § 1981.  We review the dismissal of a complaint for failure to state a claim <u>de</u> <u>novo</u>, accepting all allegations in the complaint as true and construing facts in a light most favorable to the plaintiff.  <u>Brown v. Budget Rent-A-Car Systems, Inc.</u>, 119 F.3d 922 (11th Cir. 1997).  In doing so, we are mindful of the Supreme Court's directive that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

**1.    Failure to state a cause of action for violation of EMTALA**

Congress enacted  EMTALA to prevent hospitals from failing to examine and stabilize patients who seek treatment in their emergency departments.  <u>Hardy v. New York City Health & Hosp. Corp.</u>,164 F.3d 789, 795 (2d Cir.1999); <u>see</u> <u>Bryan v. Rectors and Visitors of the Univ. of Virginia</u>, 95 F.3d 349, 351 (4th Cir.1996).

---

[2]    The district court declined to assume jurisdiction over the remaining state law claims.

Although EMTALA was not intended to be a federal malpractice statute, it was intended to protect patients by prohibiting hospitals from engaging in "patient dumping," the practice of refusing to examine or to treat patients who came to the emergency room of the hospital but might be unable to pay.  See  Holcomb v. Monahan, 30 F.3d 116, 117 n.2 (11th Cir. 1994); Summers v. Baptist Medical Ctr. Arkadelphia, 91 F.3d 1132, 1136 (8th Cir. 1996)(en banc).  EMTALA provides in relevant part:

> (a) Medical screening requirement
>
> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.
>
> (b) Necessary stabilizing treatment for emergency medical conditions and labor
>
> (1) In general  – If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either
>> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>> (B) for transfer of the individual to another medical facility in

5

accordance with subsection (c) of this section.

(c) Restricting transfers until individual stabilized

(1) Rule
If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless–

    (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

    (ii) a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

    (iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

    (B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

(2) Appropriate transfer
An appropriate transfer to a medical facility is a transfer–

    (A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health

of the unborn child;

(B) in which the receiving facility– (i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C) of this section) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

(E) which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

42 U.S.C. § 1395dd. Harry alleges causes of action under both § 1395 dd(a), the medical screening provision, and § 1395 dd(b), the stabilization provision of EMTALA.

A.    **"Appropriate medical screening" under EMTALA**

In the amended complaint, Harry asserts that Aventura should have performed a VQ scan on Normil to confirm or rule out a diagnosis of pulmonary embolism, as

a VQ scan was "the standard medical screening procedure for patients with similarly perceived medical condition[s]." While EMTALA does not define "appropriate medical screening," Harry is correct that under EMTALA a patient is entitled to receive a medical screening calculated to identify critical medical conditions. That screening must be similar to that which would be provided for any other patient with similar complaints. Holcomb, 30 F.3d at 117 ("the congressional purpose behind the enactment of EMTALA supports the conclusion that this language only requires a hospital to provide indigent patients with a medical screening similar to one which they would provide any other patient"); see Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 322 (5th Cir. 1998) ("appropriate medical screening examination" is judged by "whether it was performed equitably in comparison to other patients with similar symptoms"); Correa v. Hosp. San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995) ("The essence of this requirement is that there be some screening, and that it be administered evenhandedly.").

However, there are limitations on EMTALA's requirement of a medical screening examination. As noted earlier, EMTALA was not intended to substitute for a state malpractice claim. Its purpose is to protect patients by eliminating the practice of hospitals simply discharging or transferring patients with a medical emergency without first providing a proper screening examination and stabilizing their condition.

8

The requirement of Section 1395dd(a) of "an appropriate medical screening examination" is linked to its purpose, that is, to determine whether a medical emergency exists. 42 U.S.C. § 1395dd(a) ("[T]he hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists."). It is not intended to ensure each emergency room patient a correct diagnosis. Power v. Arlington Hosp. Assoc., 42 F.3d 851, 856 (4th Cir. 1994). As the Tenth Circuit noted in Collins v. DePaul Hosp., 963 F.2d 303 (10th Cir. 1992), "[t]he stated reason in 42 U.S.C. § 1395dd(a) for requiring a participating hospital to provide an 'appropriate medical screening examination' of one suffering from injuries who presents himself at a hospital is to determine whether an 'emergency medical condition exists.' Nothing more, nothing less." Id. at 306-07 (holding that the fact that hospital determined plaintiff had an emergency medical condition and placed him in ICU defeats a claim based on 42 U.S.C. § 1395dd(a)). See Vickers v. Nash General Hosp., Inc., 78 F.3d 139 (4th Cir. 1996) (holding that EMTALA's screening provision requires a medical examination "to determine whether or not an emergency condition exists" and is not concerned with treatment that follows from the screening).

In this case, the amended complaint asserts that Normil was diagnosed with pneumonia and possible sepsis or pulmonary embolism. The facts alleged concede

9

that Aventura conducted an initial screening examination and determined that Normil had an emergency condition, notwithstanding the lack of a VQ scan. Indeed, the hospital ultimately admitted Normil to the ICU. While Normil may have a valid malpractice claim with respect to the diagnosis, the allegations do not support a claim that the hospital did not conduct an initial screening examination to determine whether an emergency medical condition existed pursuant to 42 U.S.C. § 1395dd(a). We do not find error in the district court's dismissal of this claim.

**B.     Necessary stabilizing treatment under EMTALA**

Harry also asserts that notwithstanding the knowledge of Normil's emergency condition, the various Appellees violated EMTALA by failing to stabilize her condition. Section 1395dd(b) requires that once a hospital determines that a patient has an emergency medical condition, the hospital must provide (a) further examination and treatment to stabilize the medical condition or (b) transfer the patient in accordance with the requirements of the statute to a hospital facility that can provide necessary treatment. See Cooper v. Gulf Breeze Hosp., Inc., 839 F.Supp. 1538, 1544 (N.D.Fla. 1993) (holding that plaintiff's assertion that defendant violated the EMTALA by "failing to stabilize plaintiff's medical condition" before releasing him sufficient to state a claim under this statute); see also Brooks v. Maryland General Hosp., Inc., 966 F.2d 708, 710 (4th Cir. 1993) (holding that EMTALA requires an

10

emergency room "to stabilize the [emergency medical] condition or, if medically warranted, to transfer the person to another facility if the benefits of transfer outweigh its risks.").

Appellees assert that Harry cannot prevail in this claim because actions under § 1395dd(b) for failure to stabilize a patient are limited to only those situations in which the hospital releases or transfers the patient without first stabilizing their condition. Because Normil was eventually admitted as a patient and not transferred, Appellees argue that this provision of EMTALA is not applicable. In their brief, they cite to Correa v. Hospital San Francisco, 69 F.3d at 1190, and Cooper v. Gulf Breeze Hospital, Inc., 839 F. Supp. at 1541, for this proposition. However, Appellees' reliance on these two cases is misguided. In fact, in Correa, the First Circuit addressed the appropriate screening provision of EMTALA, not the stabilization provision. Id. at 1192-93. Moreover, the First Circuit found that § 1395dd(b) "requires that, if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, . . . unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety." Id. at 1190. Cooper is similarly inapposite, as it held that certain Florida procedural requirements for medical malpractice cases were not applicable in the context of EMTALA, and that the failure to allege that a hospital discharged a patient

11

for economic reasons did not bar an EMTALA claim. Id. at 1540. It did not address the stabilization provision, except to say that "a hospital must treat, within its capacity, any individual so as to 'stabilize' their condition *or* arrange for a transfer of the individual to another medical facility. . . . Except under certain circumstances, a hospital may not transfer an individual unless their condition has stabilized." Id. at 1541 (citation omitted) (emphasis added). At oral argument, Appellees additionally suggested that, notwithstanding the lack of any limiting language in § 1395dd(b), another part of the statute, § 1395dd(e)(3)(A), supports their argument. Section 1395dd(e)(3)(A) defines the term "to stabilize," and provides in relevant part:

> The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . .

Id.

We are persuaded that both the language of EMTALA and Congress' intent and purpose in adopting the statute defeat Appellees' argument as it relates to the period of time prior to Normil's admission as a patient. Although the scope of EMTALA is narrow, nothing in the language of Section 1395dd(b) dictates limiting this subsection in the manner the Appellees suggest. On the contrary, when a hospital determines that a medical emergency exists EMTALA specifically dictates that the hospital must

12

provide either:

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1)(A). The language of the statute does not condition the stabilizing treatment requirement upon transfer. See Battle ex rel. Battle v. Memorial Hosp. at Gulfport, 228 F.3d 544, 558 (5th Cir. 2000) ("EMTALA requires stabilization of a known emergency medical condition."); Vickers, 78 F.3d at 145 ("EMTALA requires that when a hospital 'determines that [an] individual has an emergency medical condition,' the hospital must provide for such further examination and treatment 'as may be required to stabilize the condition'") (quoting 42 U.S.C. § 1395dd(b)(1)).

Nor do we find the provision in § 1395dd(e)(3)(A), which relates to how a patient should be stabilized prior to transfer, contradicts or supercedes the plain directive in § 1395dd(b). Indeed, such a reading would be inconsistent with the language of 42 U.S.C. § 1395dd(b), which does not suggest in any way that the decision to transfer is a prerequisite to the stabilization requirement.[3] Moreover, the

---

[3] We note the distinction drawn by the court in Brodersen v. Sioux Valley Memorial Hosp., 902 F. Supp. 931, 938 n. 6 (N.D. Iowa 1995), which explained that "EMTALA contains parallel,

Appellees' reading would yield results that would contravene both common sense and the congressional purpose behind the passage of EMTALA. Under Appellees' construction of EMTALA, treatment to stabilize an emergency condition need not be rendered until a decision to transfer or release the patient has been made. But that decision may not be made immediately, or indeed for many hours. Under Appellees' reading of the statute in these circumstances, it would be permissible for a hospital to allow a patient's condition to steadily deteriorate, even to the point of death, until the decision to transfer were made, when any stabilizing treatment could come too late. Moreover, such a reading would permit hospitals to entirely defeat this provision by simply admitting a patient whom it has failed to stabilize. This scenario clearly conflicts with a common sense reading of EMTALA as well as the congressional intent to protect patients in this very circumstance.[4] See Hardy v. New York City Health & Hosp. Corp.,164 F.3d 789, 795 (2d Cir.1999) ("The core purpose of EMTALA . . . is to prevent hospitals from failing to examine and stabilize uninsured

but separate, definitions of the terms 'to stabilize' and 'stabilized.' The term 'to stabilize' indicates what the hospital must do to a patient in an emergency condition who is not transferred in accordance with subsection (c) [the statute's transfer provision]. 'Stabilized' refers to the condition the patient must be in to transfer him other than in accordance with the restrictions of subsection (c)." In other words, if a decision has not been made to transfer a patient in accordance with the requirements set out in § 1395dd(c), then the hospital must provide the necessary treatment to stabilize the patient.

[4] Likewise it would be illogical to assume that a patient with an emergency medical condition would not be protected under EMTALA if the hospital intended to transfer the individual but had not yet done so.

14

patients who seek emergency treatment."); <u>Bryan v. Rectors and Visitors of the Univ.</u> <u>of Virginia</u>, 95 F.3d 349, 351 (4th Cir.1996) ("[EMTALA's] core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy."). <u>See also</u> <u>Hussain v. Kaiser Foundation Health Plan of the Mid-Atlantic</u> <u>States, Inc.</u>, 914 F.Supp. 1331, 1334 (E.D.Va. 1996) (standing for the proposition that EMTALA's stabilization requirement applies until a patient is admitted for in-patient treatment).

Under any reasonable reading of EMTALA, a hospital's duty to stabilize a patient "arises once the hospital determines that an emergency condition exists." <u>Scott</u> <u>v. Hutchinson</u>, 959 F.Supp. 1351, 1357-58 (D.Kan. 1997); <u>see</u> <u>Summers</u>, 91 F.3d at 1140 (8th Circuit); <u>Vickers</u>, 78 F.3d at 145 (4th Circuit); <u>Urban v. King</u>, 43 F.3d 523, 526 (10th Cir. 1994). In other words, the obligation to provide "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize" the patient's condition under Section 1395dd(b) is imposed upon a hospital the moment the hospital determines that an emergency medical condition exists and continues until the patient is stabilized for transfer, release, or admission.

Given that EMTALA requires a hospital to provide such further medical examination and treatment as may be required to stabilize a patient once it has

15

determined an emergency medical condition exists, and mindful that in reviewing the dismissal of Harry's claim we must accept the allegations of a complaint as true, we conclude that the district court erred in dismissing Harry's claim under 42 U.S.C. § 1395dd(b) as it relates to the failure to stabilize Normil's condition prior to admission as an in-patient in the hospital.

**2.     Failure to state a cause of action for a violation of 42 U.S.C. § 1981**

Harry next asserts that the district court erroneously ruled that the Amended Complaint failed to state a cause of action for violation of § 1981.  The Supreme Court has stated that "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.  To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley, 355 U.S. at 47 (footnote omitted).  This Court also noted that "[w]e have repeatedly emphasized the liberality of the principles of notice pleading that govern federal procedure." Brown v. Nichols, 8 F.3d 770, 773 (11th Cir. 1993).  To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute.  See Green v. State Bar of Texas, 27 F.3d 1083,

16

1086 (5th Cir. 1994).

Appellees argue that even under the liberal notice pleading standard, a complaint must still state a cause of action sufficient to show that the plaintiff is entitled to relief. Fullman v. Graddick, 739 F.2d 553 (11th Cir. 1984) (§ 1983 claim). While this is true, we find that the plaintiff's amended complaint meets the minimal requirements to survive a motion to dismiss under Rule 12(b)(6). Indeed, the amended complaint alleges that (1) Normil was a member of a racial minority, (2) Appellees intended to discriminate based on Normil's race, and (3) the discrimination concerned an alleged contractual obligation. Therefore, we reverse the district court's ruling dismissing this claim.

For all of the foregoing reasons, we AFFIRM the district court's ruling with respect to Harry's claim under 42 U.S.C. § 1395dd(a), but REVERSE the district court's ruling with respect to Harry's claims under 42 U.S.C. § 1395dd(b) and 42 U.S.C. § 1981, and REMAND for further proceedings consistent with this opinion.

AFFIRMED IN PART AND REVERSED IN PART.