*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0355p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANDREA SMITH, Personal Representative of the
Estate of Kelly Snider Smith, deceased,
*Plaintiff-Appellee,*

      No. 04-1436

*v.*

BOTSFORD GENERAL HOSPITAL,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-71459—Avern Cohn, District Judge.

Argued: July 22, 2005

Decided and Filed: August 18, 2005

Before: GIBBONS and COOK, Circuit Judges; PHILLIPS, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Robert G. Kamenec, PLUNKETT & COONEY, Bloomfield Hills, Michigan, for
Appellant. Donald M. Fulkerson, Westland, Michigan, for Appellee. **ON BRIEF:** Robert G.
Kamenec, PLUNKETT & COONEY, Bloomfield Hills, Michigan, Ernest R. Bazzana, PLUNKETT
& COONEY, Detroit, Michigan, for Appellant. Donald M. Fulkerson, Westland, Michigan,
Geoffrey N. Fieger, FIEGER, FIEGER, KENNEY & JOHNSON, Southfield, Michigan, Marc E.
Lipton, LIPTON LAW CENTER, Southfield, Michigan, for Appellee. Gregory W. Moore, HALL,
RENDER, KILLIAN, HEATH & LYMAN, Troy, Michigan, David Arkush, Allison M. Zieve,
PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., Jeffrey Robert White, CENTER FOR
CONSTITUTIONAL LITIGATION, Washington, D.C., for Amici Curiae.

---

**OPINION**

---

    COOK, Circuit Judge. Plaintiff Andrea Smith, personal representative of the estate of Kelly
Smith, deceased, brought an action against Defendant Botsford General Hospital, alleging that it
violated the Emergency Medical Treatment and Active Labor Act ("EMTALA") when it failed to

---

[*] The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting
by designation.

stabilize Kelly Smith's condition—caused by an open femur fracture—before transporting him. Following a trial, the jury found in favor of Plaintiff and awarded $35,000.00 for economic damages and $5,000,000.00 for non-economic damages. Bostford filed several post-trial motions seeking a new trial or a damages award reduction. The district court denied the motions, and Botsford appeals.

## I

Kelly Smith, a 33-year-old man weighing approximately 600 pounds, fractured his left leg during a rollover car accident. Smith was transported to Botsford, where examining doctors diagnosed him as having an open comminuted left femur fracture—a break that causes the bone to pierce the skin. Considering its limited capacity to care for someone Smith's size, Botsford decided to transfer him to another hospital. While in the ambulance, Smith's condition began to deteriorate, and 21 minutes into the transfer, he died from extensive blood loss.

Plaintiff alleged that Bostford failed to stabilize Smith, as EMTALA requires, before transferring him. Plaintiff's witnesses testified that Smith suffered progressive blood loss and that Botsford needed to take additional measures, such as giving Smith a blood transfusion, to stabilize his condition. Botsford, by contrast, presented evidence that it had taken all appropriate steps to and did successfully stabilize Smith before transferring him, that Smith's rapid deterioration could not have been anticipated, and that Smith's weight and cocaine and alcohol use contributed to his death.

## II

"The Emergency Medical Treatment and Active Labor Act . . . places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an 'emergency medical condition.'" *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250 (1999). This case implicates EMTALA's stabilization requirements. Specifically, the Act mandates:

> (1) In general
>
> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--
>
>> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>>
>> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b). To "stabilize" under the Act "means, with respect to an emergency medical condition . . . to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). The Supreme Court clarified that a plaintiff need not prove the existence of an improper motive to bring suit under EMTALA. *Roberts*, 525 U.S. at 250.

### A.  Expert Testimony

Botsford contends that the district court abused its discretion in striking defense expert Dr. Robert Aranosian's testimony. Dr. Aranosian testified during his deposition that Smith died not from hemorrhagic shock and blood loss, but instead from cardiac arrest brought on by eight

comorbidities, including his morbid obesity, history of alcoholism, smoking, and drug abuse. Dr. Aranosian's opinion regarding Smith's chronic alcoholism stemmed from conversations with Smith's deceased relative who had at one time consulted Dr. Aranosian concerning Smith's drinking problems—but neither Dr. Aranosian nor defense counsel disclosed this information until it came out during Plaintiff's cross-examination of Dr. Aranosian at trial. Upon Plaintiff's counsel's and the court's questioning, Dr. Aranosian admitted that Smith's relative "routinely would come to my office and chat with me about his concern regarding Mr. Smith's habits and what I could do to assist him," and that outside of this personal knowledge, no other record evidence supported his opinion concerning Smith's chronic alcoholism. Then, when asked, "Did you previously disclose this to anybody?" Dr. Aranosian admitted, "Not until just now."

The district court decided to address this failure-to-disclose issue by striking entirely Dr. Aranosian's testimony. As the court saw it, Dr. Aranosian had "an affirmative obligation . . . to disclose in advance of his deposition [and trial] testimony, that he had personal knowledge, even if it was second hand," and striking only the references to chronic alcoholism would not suffice to remedy the breach of this obligation. The court further found striking Dr. Aranosian's testimony "not fundamentally unfair" to Botsford's case, given that the testimony was "largely cumulative" of the testimony of another expert witness, Dr. Dragovic—a witness the defense presented before Dr. Aranosian testified.

Botsford insists this move by the district court so prejudiced its case that it warrants reversal even under the highly deferential abuse-of-discretion standard. We, however, find no abuse of discretion with the district court's choice of sanction. Fed. R. of Civ. P. 26(a)(2)(B) requires a party to disclose "the data or other information considered by [its expert] in forming [his] opinions"—which Botsford's expert clearly failed to do here, as conceded by him under questioning. And Rule 37 authorizes—indeed, directs—exclusion of the witness as a sanction for a Rule 26 violation. *See Roberts v. Galen of Virginia, Inc*., 325 F.3d 776, 782 (6th Cir. 2003). Though Rule 37 also allows the district court to impose less stringent sanctions than mandatory preclusion, the district court's choice to observe the rule's primary directive (exclusion), rather than its secondary options, did not constitute an abuse of its broad discretion. *See Ames v. Van Dyne*, 100 F.3d 956 (Table), No. 95-3376, 1996 WL 662899, at *4 (6th Cir. Nov. 13, 1996) ("[B]ecause the district court is in the best position to determine whether a party has complied with discovery orders, its discretion is especially broad.") (citation and internal quotation marks omitted). Our conclusion is further strengthened by the district court's finding, which Botsford does not dispute, that Dr. Aranosian's testimony was cumulative of that provided by Dr. Dragovic.

### B. Application of Michigan's cap on noneconomic damages

Botsford also raises several challenges to the damages award. We first address Botsford's contention that the noneconomic damages should be reduced in accordance with the Michigan malpractice cap—an issue of first impression in this circuit. The cap, found in Mich. Comp. Laws § 600.1483, limits noneconomic damages "in an action for damages alleging medical malpractice" to $359,000.00.[1] Plaintiff, of course, vehemently objects to the application of the state cap.

As a threshold matter, we consider Plaintiff's argument that EMTALA does not incorporate state law damages caps under any circumstances. Our analysis in this regard begins and ends with the plain language of the statute. EMTALA's civil enforcement provisions specify that "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of [the Act] may, in a civil action against the participating hospital, obtain those

---

[1] The statute actually caps damages at $280,000.00 but this number changes as a result of yearly adjustments. The 2003 adjustment applicable here capped damages at $359,000.00.

damages available for personal injury *under the law of the State in which the hospital is located .
. . .*" 42 U.S.C. § 1395dd(d)(2)(A) (emphasis added).  In Plaintiff's view, this language only
requires courts to consider the *types* of damages recoverable under state law, not the amount.  In
support, Plaintiff contrasts EMTALA to the Federal Tort Claims Act, which specifies that plaintiffs
can recover damages "in the same manner and to the same extent as a private individual under like
circumstances."  28 U.S.C. § 2674.  Thus, Plaintiff reasons, had Congress intended to incorporate
state damages caps, it would have included language similar to that found in the FTCA.  We find
this argument unpersuasive.  "While we agree that the language in § 1395dd(d)(2)(A) applies to
elements of damages, we see nothing in the language of the section indicating that 'damages
available' does not also mean the amount of damages for which recovery is permitted under state
law."  *Power v. Arlington Hosp. Assoc.*, 42 F.3d 851, 862 (4th Cir. 1994).  We thus join the
majority of courts addressing the issue in finding that EMTALA's incorporation of state law
extends to caps on damages.   See *Valencia v. St. Francis Hosp. & Health Ctr.,*
03-cv-0252-LJM-WTL, 2004 U.S. Dist. Lexis 7929, at *7  (S.D. Ind. Mar. 1, 2004) (agreeing with
*Power* and listing cases); *Barris v. County of Los Angeles*, 972 P.2d 966, 973 (Cal. 1999) (same).
*But see Cooper v. Gulf Breeze Hosp., Inc.*, 839 F. Supp. 1538, 1542-43 (N.D. Fla. 1993) (discussing
the differences between medical malpractice and EMTALA and declining to apply state procedural
requirements applicable to malpractice claims).

        Whether EMTALA's incorporation of state law leads to the application of Michigan's
malpractice damages cap is the next question.  Though we find no decision addressing the
applicability of Michigan's malpractice damages cap to an EMTALA failure-to-stabilize claim, we
take guidance from the Fourth Circuit's decision in *Power*, which instructed:  "the appropriate
starting point for analyzing whether [a state] malpractice cap applies and what damages are
available . . . is [this] threshold question . . . : Whether [the plaintiff's] EMTALA claim would be
deemed a malpractice claim under [state law]?" *Power*, 42 F.3d at 860.

        Agreeing with *Power* that this approach "best effectuates Congress's direction that courts
should look to state law to determine what damages are available in an EMTALA action," *id.* at
864, we follow it here to determine the applicability of Michigan's malpractice damages cap.  We
thus focus our inquiry on whether Plaintiff's failure-to-stabilize claim would constitute a medical
malpractice claim under Michigan law.

        The Michigan Supreme Court recently articulated the test for determining "whether the
nature of a claim is ordinary negligence or medical malpractice" in *Bryant v. Oakpointe Villa
Nursing Ctr.*, 684 N.W.2d 864, 869 (Mich. 2004).  *Bryant* instructs that courts undertaking this
analysis should first ask "whether [the claim] is being brought against someone who, or an entity
that, is capable of malpractice."  *Id.* at 870.  Then, according to *Bryant*, courts should consider
whether "the alleged claim sounds in medical malpractice"—which, in turn, depends on the
resolution of two additional questions:  "(1) whether the claim pertains to an action that occurred
within the course of a professional relationship; and (2) whether the claim raises questions of
medical judgment beyond the realm of common knowledge and experience."  *Id*. at 870-71.  "If
both these questions are answered in the affirmative, the action is subject to the procedural and
substantive requirements that govern medical malpractice actions."  *Id*. at 871.

        With respect to the second of the two questions, *Bryant* identified the need for expert
testimony as the key distinguishing feature of claims involving medical judgment:

        If the reasonableness of the health care professionals' action can be evaluated by lay
        jurors, on the basis of their common knowledge and experience, it is ordinary
        negligence.  If, on the other hand, the reasonableness of the action can be evaluated
        by a jury only after having been presented the standards of care pertaining to the

medical issue before the jury explained by experts, a medical malpractice claim is involved.

*Id*. at 872.

Plaintiff does not dispute that Botsford is an entity capable of malpractice or that the claim "pertains to an action that occurred within the course of a professional relationship." Instead she premises her objection to the classification of her claim as a malpractice action on the ground that it does not raise questions of "medical judgment." This is so, Plaintiff reasons, because the EMTALA claim requires no breach of the professional standard of care—the hallmark of traditional malpractice claims. But, while *Bryant* acknowledged that the traditional definition of malpractice "*contribut[es]* to an understanding of what constitutes a 'medical judgment,'" *id*. (emphasis added), it did not limit "medical judgment" to claims arising from a breach of the professional standard of care. To the contrary, as we see it, *Bryant*'s own application of the standards it outlined reflects a much broader interpretation of malpractice, with the defining element being the need for experts. *See id.* at 873-74 (deeming claim that the defendant failed to train its staff to recognize that beds posed risk of asphyxia malpractice because "the ability to assess the risk of positional asphyxia and, thus, the training of employees to properly assess that risk, involves the exercise of professional judgment," "[g]iven the patent need . . . for expert testimony"); *id*. at 875 (finding allegation that the defendant failed to inspect beds to eliminate risk of positional asphyxia "beyond the ken of common knowledge," and thus sounding in medical malpractice, because "[t]he risk assessment at issue . . . require[d] understanding and consideration of the risks and benefits of using and maintaining a particular set of restraints in light of a patient's medical history and treatment goals.").

Reading *Bryant* in this manner, we have no difficulty concluding that this EMTALA failure-to-stabilize claim would constitute a malpractice action under Michigan law. Like the claims *Bryant* deemed malpractice actions, compliance with EMTALA's stabilization requirements entails medical judgment (assuring "*within reasonable medical probability*, that no material deterioration of the condition is likely," 42 U.S.C. § 1395dd(e)(3)(A) (emphasis added))—understood, as this case exemplifies—only through expert testimony. We thus conclude Michigan's cap on malpractice damages limits Plaintiff's non-economic damages to $359,000.00.

### C. Constitutionality of Mich. Comp. Laws. § 600.1483

Our conclusion that Michigan's malpractice damages cap applies necessitates addressing Plaintiff's alternative challenge to the constitutionality of the cap. Specifically, Plaintiff insists that Mich. Comp. Laws § 600.1483 violates the Seventh Amendment and the Equal Protection Clause. Drawing on the reasoning of courts upholding caps on damages, we find neither argument availing.

### 1. Seventh Amendment

In *Boyd v. Bulala*, 877 F.2d 1191 (4th Cir. 1989)*,* the Fourth Circuit held that Virginia's cap on medical malpractice damages did not violate the Seventh Amendment. In its view, the jury's role "as factfinder [is] to determine the extent of a plaintiff's injuries," not "to determine the legal consequences of its factual findings." *Id*. at 1196. Additionally, the court reasoned: "If a legislature may completely abolish a cause of action without violating the right of trial by jury, we think it permissibly may limit damages recoverable for a cause of action as well." *Id. See also Phillips v. Mirac, Inc*., 685 N.W.2d 174, 180 (Mich. 2004) (echoing the reasoning in *Boyd* and finding a cap on damages lawful under the Michigan constitution's analogous jury right).

We find this reasoning persuasive and conclude that Mich. Comp. Laws § 600.1483—implicating no protected jury rights—does not offend the Seventh Amendment.

### 2. Equal Protection

Plaintiff's equal-protection challenge fares no better. Though Plaintiff urges us to apply heightened scrutiny, she supplies no basis for doing so. As the Fourth Circuit noted in *Boyd*, "a limitation on a common law measure of recovery does not violate a fundamental right or create a suspect classification." 877 F.2d at 1196. Instead, it "is 'a classic example of an economic regulation' . . . subject only to limited 'rational basis' review." *Id.* at 1196-97 (internal citations omitted). "Under a rational basis review, a statute is valid if it rationally furthers a legitimate governmental interest." *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 806 (6th Cir. 2005). We accord the statute "a strong presumption of validity," and uphold it "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (citations and internal quotation marks omitted).

In *Zdrojewski v. Murphy*, a Michigan appellate court addressing an equal-protection challenge to Mich. Comp. Laws § 600.1483 concluded that the statute satisfies the rational basis test. 657 N.W.2d 721, 739 (Mich. Ct. App. 2002). The court opined:

> The purpose of the damages limitation was to control increases in health care costs by reducing the liability of medical care providers, thereby reducing malpractice insurance premiums, a large component of health care costs. Controlling health care costs is a legitimate governmental purpose. By limiting at least one component of health care costs, the noneconomic damages limitation is rationally related to its intended purpose.

*Id.* (internal citations omitted). This decision's sound reasoning moves us to conclude as it did that Mich. Comp. Laws § 600.1483 survives rational-basis scrutiny. Plaintiff's equal-protection argument thus fails.

### D. Reduction of future damages to present value

Botsford also insists that the district court's failure to ensure the reduction of future damages to present value—by refusing to give the jury a verdict form distinguishing between past and future damages or, in the alternative, to instruct the jury to reduce future damages to present value—violates Michigan law, Mich. Comp. Laws §§ 600.6304-6306, and entitles it to a new trial on damages. First, we agree with Plaintiff that Botsford forfeited its argument regarding the verdict form by failing to properly object. Though Botsford generally objected to the court's non-use of the verdict form, it did not, as Plaintiff points out, premise that argument on the need to reduce future damages to present value. Nor did Botsford object to the form ultimately chosen on the ground that it did not differentiate past and future damages. Thus, Botsford failed to put the district court on notice of a potential issue regarding future damages and present-value calculation.

Botsford did preserve its challenge to the district court's failure to instruct the jury to reduce future damages to present value, but this claim lacks merit. We review a court's refusal to give a requested instruction for abuse of discretion. *Fisher v. Ford Motor Co.*, 224 F.3d 570, 576 (6th Cir. 2000). As Botsford contends, Michigan law requires reduction of future damages to present value. *See* Mich. Comp. Laws § 600.6306. But the Michigan Supreme Court has also instructed that juries should consider inflation when ascertaining future damages, even if the plaintiff presents no evidence on the issue. *Kovacs v. Chesapeake and Ohio Ry. Co.*, 397 N.W.2d 169, 170 (Mich. 1986); *Haas v. Briggs*, No. 224753, 2002 Mich. App. Lexis 1269, at *4 (Mich. Ct. App. Sept. 3, 2002). Botsford's requested instruction would have directed the jury to reduce future damages to present value without providing a corresponding inflation instruction. The district court denied the request because of this deficiency, and we find no abuse of discretion in this decision. In any event, the absence of an inflation instruction renders any claim that Botsford suffered harm as a result of the instruction purely speculative. *Great Am. Ins. Cos. v. Garan, Lucow, Miller, Seward, Cooper & Becker, P.C., et al.*, No. 203014, 1998 WL 1989994, at *2 (Mich. Ct. App. Sept. 4, 1998). It is

entirely plausible that the jury's upward adjustment for inflation would have equaled, or even exceeded the reduction for present value. *Kirchgessner v. United States*, 958 F.2d 158, 162 (6th Cir.1992); *Howard v. Chesapeake & Ohio Ry. Co.*, 812 F.2d 282, 287 (6th Cir. 1987).

### E.  Remittitur

Pressing the purportedly excessive nature of the noneconomic damages awarded in this case, Botsford seeks remittitur or a new trial on damages.  We need not address this argument in light of our holding that Mich. Comp. Laws § 600.1483 requires that the award be reduced to $359,000.00.

### F.  Request for a new judge on remand

Finally, Botsford requests that this court order the assignment of a new district judge to handle all future proceedings.  Our decision requires remand for the limited purpose of applying Michigan's cap on damages.  Botsford fails to present any evidence warranting reassignment for this task.

### III

Because we find the district court should have applied Mich. Comp. Laws § 600.1483 to limit the noneconomic damages in this case, we reverse the district court's holding on this point and remand for reduction of noneconomic damages to $359,000.00 in accordance with Michigan law. In all other respects, we affirm.