[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-13205

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 16, 2002
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-00786-CV-KMM

BERNIE HARRY, as Personal
Representative of the Estate
of Lisa Normil, deceased,

Plaintiff-Appellant,

versus

WAYNE MARCHANT, M.D.,
ALI BAZZI, M.D., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 16, 2002)**

Before ANDERSON, Chief Judge, and TJOFLAT, EDMONDSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON,
Circuit Judges.

BLACK, Circuit Judge:

This case involves the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. EMTALA was enacted to prevent "patient dumping," the publicized practice of some hospitals turning away or transferring indigent patients without evaluation or treatment. Under EMTALA, when an individual presents for treatment at the emergency department of a hospital, the hospital must provide an appropriate medical screening to determine whether an emergency medical condition exists. If an emergency medical condition is determined to exist, the hospital ordinarily must provide stabilization treatment before transferring the patient.[1] The issue before this Court is whether EMTALA imposes a federal statutory obligation on a hospital to provide stabilization treatment to a patient with an emergency medical condition who is not transferred. We hold no such duty exists under EMTALA.

## I. BACKGROUND

A. <u>Factual Background</u>

The complaint in this case alleges the following facts. At approximately 1:17 a.m. on November 26, 1997, Miami-Dade Fire Rescue brought Lisa Normil to

---

[1]"Transfer" is defined as "the movement (including the discharge) of an individual outside of a hospital's facilities." 42 U.S.C. § 1395dd(e)(4) (1994). We use the term "transfer" in this opinion as defined in EMTALA. Reference to a patient who is "transferred," therefore, will apply equally to a patient who is discharged.

the emergency room at Aventura Hospital and Medical Center (Aventura Hospital) and requested medical treatment on her behalf. Normil was seen first by Dr. Wayne Marchant, an emergency room physician, whose notes indicated a diagnosis of "pneumonia rule out sepsis."

Dr. Marchant contacted Dr. Kevin Coy, who was acting as the on-call attending physician on behalf of Normil's primary care provider, to report his diagnosis and to request permission to admit Normil into the intensive care unit (ICU) of the hospital for concentrated care and management.[2] Dr. Coy refused to authorize admission into the ICU and instead directed Dr. Marchant to obtain a ventilation perfusion scan (VQ Scan). Dr. Marchant advised Dr. Coy a VQ Scan could not be performed because the hospital had insufficient isotopes to conduct the scan. Despite the unavailability of a VQ Scan, Dr. Coy continued to deny authorization for Normil's admittance into the ICU.

Later that morning, Dr. Marchant was able to contact Normil's primary care physician, Dr. Ali Bazzi. Approximately five hours after he was contacted by

---

[2]In most cases, emergency room physicians do not have hospital admitting privileges and must depend on the approval of the attending or primary care physician for admittance. S. Rep. No. 99-146, at 471 & 482, *reprinted in* 1986 U.S.C.C.A.N. 42, 430 & 441 (statement submitted by the American College of Emergency Physicians); *see also Reed v. Good Samaritan Hosp. Ass'n, Inc.*, 453 So. 2d 229 (Fla. Dist. Ct. App. 1984).

Dr. Marchant, Dr. Bazzi examined Normil in the emergency room, reviewed her available radiological evidence, and assessed her vital signs. Following Normil's examination by Dr. Bazzi, she was admitted into the ICU at Aventura Hospital. Although Dr. Bazzi prescribed antibiotics, the ICU nurse, Polly Linker, never administered the medication.

After Normil's admittance into the ICU, she lapsed into respiratory and cardiac failure. Dr. Christopher Hanner, a physician working at the hospital, unsuccessfully attempted to resuscitate Normil. She died at approximately 12:45 p.m.

B. Procedural Background

Following Normil's death, Appellant Bernie Harry, personal representative of her estate, filed suit against Dr. Marchant, Dr. Bazzi, Dr. Hanner, Dr. Coy, Linker, and Aventura Hospital[3] (collectively, Appellees). In his complaint, Appellant alleged Aventura Hospital violated EMTALA by failing to stabilize and treat Normil's emergency medical condition.[4] Appellant, however, did not allege

[3]The complaint named Miami Beach Healthcare Group, Ltd., d/b/a Aventura Hospital and Medical Center as a defendant.

[4]The complaint alleged two additional federal law claims against Aventura Hospital: violation of EMTALA's appropriate medical screening requirement and violation of 42 U.S.C. § 1981. Dr. Bazzi and Linker also were alleged to have violated § 1981. In addition, the complaint alleged a number of state law claims,

4

Normil was transferred by Aventura Hospital. Rather, Appellant's primary allegation under EMTALA was the treatment provided to Normil was negligent and not sufficiently aggressive to treat and stabilize her condition.

In response to Appellant's complaint, Aventura Hospital moved to dismiss for failure to state a claim under EMTALA.[5] The district court granted the motion with prejudice.[6] On appeal, a panel of this Court reversed, holding the allegations contained in Appellant's complaint supported a claim against Aventura Hospital under EMTALA for failing to treat and stabilize Normil's condition. *Harry v. Marchant*, 237 F.3d 1315, *vacated, reh'g granted en banc,* 259 F.3d 1310 (11th

---

including wrongful death claims against all Appellees, a negligence *per se* claim against Aventura Hospital, and a vicarious liability claim against Aventura Hospital. Drs. Marchant, Coy, and Hanner were sued only under state law.

[5]The Appellees sued under § 1981 and the Appellees sued under state law sought dismissal of those claims.

[6]The § 1981 claims also were dismissed with prejudice. Declining supplemental jurisdiction, the district court dismissed the state law claims without prejudice. The state law claims were subsequently pursued by Appellant in state court.

Cir. 2001).[7]  Rehearing *en banc* was granted solely to determine the scope of EMTALA's stabilization requirement.

## II. STANDARD OF REVIEW

We review *de novo* the dismissal of a complaint for failure to state a claim, accepting all allegations in the complaint as true and construing facts in the light most favorable to the plaintiff. *Brown v. Budget Rent-A-Car Sys., Inc.*, 119 F.3d 922, 923 (11th Cir. 1997).

## III. DISCUSSION

In 1986, Congress enacted EMTALA in response to widely publicized reports of emergency care providers transferring indigent patients from one hospital to the next while the patients' emergency medical conditions worsened. EMTALA was designed specifically to address this important societal concern; it was not intended to be a federal malpractice statute.  Under EMTALA, hospital emergency rooms are subject to two principal obligations, commonly referred to as the appropriate medical screening requirement and the stabilization requirement. *See* 42 U.S.C. § 1395dd (1994).  The appropriate medical screening requirement

---

[7]The panel further held the allegations contained in the complaint did not support a claim against Aventura Hospital for failing to conduct an appropriate medical screening to determine whether Normil suffered from an emergency medical condition.  237 F.3d 1319-20.  The panel, however, concluded the complaint did support the claims for violation of § 1981. *Id.* at 1322.

obligates hospital emergency rooms to provide an appropriate medical screening to any individual seeking treatment in order to determine whether the individual has an emergency medical condition. *Id.* §1395dd(a). If an emergency medical condition exists, the hospital is required to provide stabilization treatment before transferring the individual. *Id.* §1395dd(b). The sole issue before this Court is the extent to which EMTALA requires a hospital to provide stabilization treatment to a patient with an emergency medical condition who is not transferred.[8]

In resolving this issue, we begin by scrutinizing the language of the statute. Then, we review the statute's legislative history. Finally, we examine the cases discussing EMTALA's stabilization requirement.

A. Language of the Statute

As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S. Ct. 755, 760 (1999); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739, 109 S. Ct. 2166, 2172 (1989); *United States v. Gilbert*, 198 F.3d 1293, 1298 (11th Cir. 1999). "In construing a statute we must begin, and often should end as well, with the language of the statute

---

[8]In this case, Normil was screened, treated, and eventually admitted. Consequently, Aventura Hospital did not "transfer" her as defined by EMTALA.

7

itself." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc)

(quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1185 (11th Cir. 1997)).  We

do this because we "presume that Congress said what it meant and meant what it

said."  *Steele*, 147 F.3d at 1318.

The stabilization requirement of EMTALA provides in relevant part:

> (b) Necessary stabilizing treatment for emergency medical conditions and labor.
>
>> (1) In general.
>>
>> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
>>
>>> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required *to stabilize* the medical condition, or
>>>
>>> (B) for transfer of the individual to another medical facility in accordance with subsection (c).[9]

42 U.S.C. § 1395dd(b)(1) (1994) (emphasis added).

---

[9]Subsection (c) delineates the standards for making an appropriate transfer and sets forth  procedures for transferring patients who are not stabilized.  42 U.S.C. § 1395dd(c).

The term "to stabilize" is specifically defined by the statute.  Under EMTALA, the term "to stabilize" means "with respect to an emergency medical condition . . . [a hospital must] provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility."  42 U.S.C. § 1395dd(e)(3)(A).  When a statute includes an explicit definition, that definition must be followed, even if it varies from the term's ordinary meaning.  *See Stenberg v. Carhart*, 530 U.S. 914, 942, 120 S. Ct. 2597, 2615 (2000).  Thus, to the extent the definition of "to stabilize" departs from its common or ordinary usage, the statutory prescription governs.

In order to accurately determine the requirements of EMTALA, we must insert the definition of the term "to stabilize" where the term is used in the statute.  When the definition of "to stabilize" is inserted into the stabilization requirement, the statute provides:

> (b) Necessary stabilizing treatment for emergency medical conditions and labor.
>
> (1) In general.
>
> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an

9

emergency medical condition, the hospital must provide either—

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required [*to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility*], or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd(b)(1). Reading the statute in its specifically defined context, it is evident EMTALA mandates stabilization of an individual only in the event of a "transfer" as defined in EMTALA.[10]

By limiting application of the stabilization requirement to patient transfers, the statutory structure of §1395dd(b)(1) makes sense. The statute is logically structured to set forth two options for transferring a patient with an emergency medical condition: a hospital must either provide stabilization treatment prior to transferring a patient pursuant to subsection (A), or, pursuant to subsection (B), provide no treatment and transfer according to one of the statutorily recognized exceptions. Hence, the stabilization requirement *only* sets forth standards for

---

[10]*See supra* note 1.

10

transferring a patient in either a stabilized or unstabilized condition. By its own terms, the statute does not set forth guidelines for the care and treatment of patients who are not transferred.

This construction gives full effect to the language and structure of the stabilization requirement. "[I]t is an elementary principle of statutory construction that, in construing a statute, we must give meaning to all the words in the statute." *Legal Envtl. Assistance Found., Inc. v. EPA*, 276 F.3d 1253, 1258 (11th Cir. 2001) (citing *Bailey v. United States*, 516 U.S. 137, 146, 116 S. Ct. 501, 507 (1995)); *see also United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991) ("A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage."). Construing EMTALA to mandate stabilization treatment irrespective of a transfer renders the words "during the transfer," contained in the statutory definition of the term "to stabilize," superfluous.[11] To give effect to the

---

[11]Additionally, interpreting EMTALA to require stabilization treatment outside the context of a transfer raises questions not answered by Congress, such as: when the duty to provide stabilization treatment terminates; if treatment is prolonged, and transfer is not imminent, how long treatment must be provided; and when the temporal delay between a determination of an emergency medical condition and the initiation of treatment constitutes a violation of a duty to provide stabilization treatment. Of course, such an interpretation would lead to the imposition of arbitrary limits, not supported by the statutory text, in an effort to fill the patent gaps of legislative direction.

11

clear language of the statute, we must conclude the triggering mechanism for stabilization treatment under EMTALA is transfer.

B. <u>Legislative History</u>

Where the language of a statute is unambiguous, as it is here, we need not, and ought not, consider legislative history. *See United States v. Gonzales*, 520 U.S. 1, 6, 117 S. Ct. 1032, 1035 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history."); *see also Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc) ("When the import of the words Congress has used is clear, . . . we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language."). Even if a statute's legislative history evinces an intent contrary to its straightforward statutory command, "we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48, 114 S. Ct. 655, 662 (1994); *see also CBS, Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1229 (11th Cir. 2001); *United States v. Weaver*, 275 F.3d 1320, 1331 (11th Cir. 2001); *Harris*, 216 F.3d at 976; *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999). Regardless of its clarity or specificity, we do not give legislative history more weight than unambiguous statutory language because "[t]he statutory language itself is the principal battlefield where the warring

12

interests struggle against each other, and it is to that battlefield we should look for the results of the battle." *CBS, Inc.*, 245 F.3d at 1228.

Despite this important elementary principle of statutory construction, "sometimes judges . . . cannot resist the temptation to set out [legislative] history." *Harris*, 216 F.3d at 977; *see also Weaver*, 275 F.3d at 1332 ("Notwithstanding this recognized plain meaning rule, judges sometimes have not resisted the temptation to set out and discuss legislative history.  We equally succumb." (citations omitted)).  We likewise succumb and examine the legislative history of EMTALA. *Gilbert*, 198 F.3d at 1299 ("Given the plain meaning of the statutory language, we could bypass any consideration of legislative history.  Nevertheless, for the sake of completeness, and because this is our first occasion to decide a Hyde Amendment case, we will look at that history.") (internal marks, footnote, and citations omitted).

The legislative history of EMTALA indicates it was intended to prevent "patient dumping," the practice of some hospital emergency rooms turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment.  *See* H.R. Rep. No. 99-241, pt. 3, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 726, 726-27; *see also Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039-41 (D.C. Cir. 1991); *Cleland v. Bronson Health Care Group,*

13

*Inc.*, 917 F.2d 266, 268-69 (6th Cir. 1990). In enacting EMTALA, Congress was concerned with widespread reports of emergency rooms "dumping" indigent patients from one hospital to the next without regard to the patients' medical conditions. *See* 131 Cong. Rec. S13,904 (1985) (remarks of Sens. Durenberger, Kennedy, Dole, Baucus, Heinz, and Proxmire). Congress' solution was to guarantee patient entry into the medical system via mandatory appropriate medical screenings and stabilization prior to transfer.[12] *See* S. Rep. No. 99-146, at 462, 464 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 421, 423 (letter submitted by the law firm of Kenny Nachwalter & Seymour) ("Section 124 [of the bill containing an early version of EMTALA] seeks to prohibit inappropriate patient transfers and to require a medical screening examination for each patient who requests one."). The primary legislative goal of EMTALA was remedying the problem of inappropriate patient transfers by hospitals. *See* S. Rep. No. 99-146, at 469-70 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 428-29 (statement submitted by the American College of Emergency Physicians) ("The American College of Emergency Physicians shares the Committee's concerns and does not condone inappropriate patient transfers, some of which have recently come to light in the television and newspaper

---

[12]Some limited exceptions to the stabilization requirement exist. *See supra* note 9.

media. . . . [W]e are in agreement with the objective of the legislation (i.e., to eliminate inappropriate patient transfers)."); *see also* S. Rep. No. 99-146, at 475 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 434  (policy statement on transfer of patients) ("Patients should not be transferred to another facility without first being stabilized.  Stabilization includes adequate evaluation and initiation of treatment to assure the transfer of a patient will not, within reasonable medical probability, result in death, or loss or serious impairment of bodily parts or organs."); 131 Cong. Rec. S13,904 (1985) (remarks of Sen. Kennedy) ("Public hospitals have reported to us a 400-percent rise in the number of patients who have been sent to their emergency rooms after visiting another hospital.").

The legislative history of EMTALA makes clear the statute was not intended to be a federal malpractice statute, but instead was meant to supplement state law solely with regard to the provision of limited medical services to patients in emergency situations.  *See* 131 Cong. Rec. S13,904 (1985) (remarks of Sen. Kennedy) ("Some States have laws which ensure that no emergency patient is denied emergency care because of inability to pay.  But, 28 States have no such law. Federal legislation in this area is long overdue."); *see also Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999); *Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998)*; Vickers v.*

15

*Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994). EMTALA was not intended to establish guidelines for patient care, to replace available state remedies, or to provide a federal remedy for medical negligence. *See Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 350-52 (4th Cir. 1996); *Vickers*, 78 F.3d at 142-43; *Holcomb*, 30 F.3d at 116. Indeed, EMTALA expressly contains a non-preemption provision for state remedies. *See* 42 U.S.C. § 1395dd(f) (1994) ("The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.").

The legislative history of EMTALA is consistent with the clear language of the statute. EMTALA's main objective was to prevent the practice of "patient dumping." By mandating treatment only in the context of a patient transfer, the stabilization requirement addresses Congress' concern regarding rejection of patients without converting EMTALA into a federal malpractice statute. In prescribing minimal standards for screening and transferring patients, but not for patient care outside these two narrowly defined contexts, Congress confined EMTALA solely to address its concerns and, at the same time, avoided supplanting available state malpractice and tort remedies.

C. Cases Discussing EMTALA's Stabilization Requirement

16

In the sixteen years since EMTALA's enactment, there have been relatively few cases discussing the stabilization requirement imposed by the statute. The only opportunity we have had to address EMTALA was in *Holcomb v. Monahan*, 30 F.3d 116 (11th Cir. 1994). Although we did not squarely address whether EMTALA's stabilization requirement imposes an obligation on hospitals to provide treatment to individuals outside the context of a transfer, our discussion in *Holcomb* is consistent with our conclusion here.

In *Holcomb*, a patient was discharged after a hospital provided an appropriate medical screening and determined there was no emergency medical condition. *Id.* Subsequently, the patient died and the administratix of the patient's estate brought suit claiming violations of §§ 1395dd(a) and (b). *Id.* In addressing the plaintiff's claims, we set forth the requirements that must be established to succeed on a § 1395dd(b) stabilization requirement claim: (1) the patient had an emergency medical condition; (2) the hospital knew of the condition; (3) the patient was not stabilized before being transferred; and (4) the hospital neither obtained the patient's consent to transfer nor completed a certificate indicating the transfer would be beneficial to the patient. *Id.* Although we did not need to, and did not, discuss the contours of the stabilization requirement, the stated elements

could be read to imply that stabilization treatment, and any claim under EMTALA arising therefrom, arises only in the context of a transfer.

Like this Circuit, no other Circuit has squarely addressed whether EMTALA's stabilization requirement imposes an obligation on hospitals to provide treatment to individuals outside the context of a transfer.[13] To date, cases from other Circuits discussing EMTALA's stabilization requirement have addressed only tangential issues arising out of an alleged failure to provide an appropriate medical screening, an alleged failure to stabilize an emergency medical

---

[13]We recognize the Fourth Circuit opinion in *In re Baby "K"*, 16 F.3d 590 (4th Cir. 1994) could be interpreted as addressing the contours of the stabilization requirement. Nonetheless, just two years later, in *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996), the Fourth Circuit clarified that *Baby "K"* only addressed the issue of whether EMTALA's stabilization requirement mandates treatment of the emergency medical condition presented to the hospital or the general medical condition of the patient. Thus, the Fourth Circuit has held *Baby "K"* did not reach the issue of whether the stabilization requirement only applies in the event of a transfer.

condition prior to an actual transfer, or a combination thereof.[14]  We, therefore, rely solely on the clear language of the statute in reaching our conclusion.

## IV. CONCLUSION

There is no duty under EMTALA to provide stabilization treatment to a patient with an emergency medical condition who is not transferred.  Because

[14]*See Baker v. Adventist Health, Inc.*, 260 F.3d 987 (9th Cir. 2001); *Jackson v. E. Bay Hosp.*, 246 F.3d 1248 (9th Cir. 2001); *Williams v. United States*, 242 F.3d 169 (4th Cir. 2001); *Arrington v. Wong*, 237 F.3d 1066 (9th Cir. 2001); *Battle v. Mem'l Hosp.*, 228 F.3d 544 (5th Cir. 2000); *Reynolds v. MaineGeneral Health*, 218 F.3d 78 (1st Cir. 2000); *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068 (8th Cir. 2000); *Cherukuri v. Shalala*, 175 F.3d 446 (6th Cir. 1999); *Lopez-Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999); *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789 (2d Cir. 1999); *Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319 (5th Cir. 1998); *Roberts v. Galen of Va., Inc.*, 111 F.3d 405 (6th Cir. 1997), *rev'd by Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 119 S. Ct. 685 (1999); *Vargas ex rel. Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202 (9th Cir. 1996); *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349 (4th Cir. 1996); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132 (8th Cir. 1996); *James v. Sunrise Hosp.*, 86 F.3d 885 (9th Cir. 1996); *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139 (4th Cir. 1996); *Correa v. Hosp. San Francisco*, 69 F.3d 1184 (1st Cir. 1995); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995); *Urban ex rel. Urban v. King*, 43 F.3d 523 (10th Cir. 1994); *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519 (10th Cir. 1994); *Holcomb v.  Monahan*, 30 F.3d 116 (11th Cir. 1994); *In re Baby "K"*, 16 F.3d 590 (4th Cir. 1994); *King v. Ahrens*, 16 F.3d 265 (8th Cir. 1994); *Green v. Touro Infirmary*, 992 F.2d 537 (5th Cir. 1993); *Johnson v. Univ. of Chicago Hosps.*, 982 F.2d 230 (7th Cir. 1993); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872 (4th Cir. 1992); *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412 (9th Cir. 1991); *Burditt v. U.S. Dep't of Health & Human Servs.*, 934 F.2d 1362 (5th Cir. 1991); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D.C. Cir. 1991); *Stevison v. Enid Health Sys., Inc.*, 920 F.2d 710 (10th Cir. 1990); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990); *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131 (6th Cir. 1990).

Normil was not transferred, Appellant's §1395dd(b) stabilization requirement claim fails to state a valid cause of action. In so holding, we recognize Appellant is not without recourse. Remedies provided by state malpractice and tort law remain available to redress negligent patient care by hospitals. Accordingly, the judgment of the district court is affirmed with respect to the dismissal of the EMTALA claims (§§ 1395dd(a) and (b)), and reversed, in accordance with the panel opinion, with respect to the dismissal of Appellant's §1981 claim.[15]

AFFIRMED in part, REVERSED in part, and REMANDED.

_____

[15]We reinstate the panel opinion except for Part 1.B., which discusses EMTALA's stabilization requirement.

BARKETT, Circuit Judge, concurring:

Upon reconsidering the language of EMTALA, I concur in the opinion of the court and agree that because Lisa Normil was admitted as a patient, redress for negligence occurring during her emergency room care is available through state medical malpractice laws, rather than federal law.