[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15675

_____

D. C. Docket No. 1:11-cv-21262-PCH

CAMILA MARIA SILVA-HERNANDEZ,

Plaintiff-Appellant,

versus

US BUREAU OF CITIZENSHIP
AND IMMIGRATION SERVICES,
MIAMI FLORIDA,
US ATTORNEY GENERAL, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 13, 2012)

Before MARCUS and BLACK, Circuit Judges, and EVANS,[*] District Judge.

PER CURIAM:

_____

[*]Honorable Orinda Evans, United States District Judge for the Northern District of
Georgia, sitting by designation.

This appeal presents an issue of statutory interpretation arising from the Cuban Adjustment Act of 1966 (CAA), Pub. L. No. 89-732, 80 Stat. 1161 (reproduced as a historical note to 8 U.S.C. § 1255). Camila Silva-Hernandez contends that the pattern and practice delineated in Section 23.11(m)(2) of the United States Citizenship and Immigration Services (Immigration Service) Adjudicator's Field Manual violates the plain and unambiguous language of the CAA. Section 23.11(m)(2) dictates that the lawful permanent resident status of a non-Cuban spouse cannot predate the date of the non-Cuban spouse's marriage to a Cuban national. After reviewing the statutory language, we conclude the Immigration Service's pattern and practice of limiting the date of lawful permanent residence based on the date of marriage is contrary to the unambiguous language of the CAA.

## I. BACKGROUND

The relevant facts are undisputed. Silva-Hernandez is a native and citizen of Brazil. On December 20, 2001, Silva-Hernandez was admitted to the United States as a B-2 nonimmigrant visitor for pleasure, and overstayed her visa. On August 27, 2010, she married Eduardo Hernandez, a native and citizen of Cuba who had adjusted his status to lawful permanent resident under the CAA, and has been a permanent resident since April 9, 2000.

2

On October 5, 2010, Silva-Hernandez filed an application for adjustment of status under the CAA based on her marriage to Hernandez.  On February 10, 2011, the Immigration Service approved Silva-Hernandez's application.  In approving her application, the Immigration Service recorded her lawful permanent resident status as of August 27, 2010, the date of her marriage, as provided in the Immigration Service Adjudicator's Field Manual.

Silva-Hernandez filed a Complaint against the Immigration Service[1] seeking (1) an order declaring that the Immigration Service's legal position and practice regarding the rollback date for non-Cuban spouses and children violates the plain and unambiguous language of Section 1 of the CAA and is an error of law, as well as arbitrary and capricious; (2) an order declaring that the Immigration Service's refusal to create a record of Silva-Hernandez's admission for permanent residence as of a date thirty months prior to the filing of her adjustment application or the date of her last arrival into the United States (whichever date is later) is an error of law, and arbitrary and capricious; (3) an order in the form of a writ of mandamus compelling the Immigration Service to

---

[1]  Silva-Hernandez's Complaint was brought against the U.S. Bureau of Citizenship and Immigration Services, Miami, Florida; U.S. Attorney General; Secretary for the Department of Homeland Security; U.S. Citizenship and Immigration Services; and National Benefits Center, U.S. Citizenship and Immigration Services.  For ease of reference, we refer to the Immigration Service as the opposing party throughout the opinion.

3

create *nunc pro tunc* a record of Silva-Hernandez's admission for permanent residence as of April 5, 2008 (i.e., the date thirty months prior to the filing of her adjustment application) and immediately issue her a new/corrected Permanent Resident Card indicating a "Resident Since" date of April 5, 2008; and (4) an order granting an injunction barring the Immigration Service from applying the "rule" or "policy" delineated in Section 23.11(m)(2) of the Immigration Service's Adjudicator's Field Manual regarding the rollback provisions for non-Cuban spouses and children.

The parties filed competing motions for summary judgment. In granting the Immigration Service's motion for summary judgment and denying Silva-Hernandez's motion for summary judgment, the district court found that Section 1 of the CAA was ambiguous regarding whether a non-Cuban spouse is entitled to a "rollback date" prior to the date of the qualifying marriage. The district court concluded the CAA does not contain explicit language stating that non-Cuban spouses are entitled to benefits arising prior to the date of the qualifying marriage. Further, the district court found the statute presupposes the existence of a marital relationship. *Silva-Hernandez v. Swacina*, 827 F. Supp. 2d 1352, 1357 (S.D. Fla. 2011).

4

The district court then turned to the legislative history of the CAA to determine Congress's intent, and found that "a literal application of the CAA's spousal and rollback provisions, . . . would yield results that are absurd in light of their legislative intent." *Id.* at 1360. The court concluded Section 23.11(m)(2) of the Immigration Service Adjudicator's Field Manual was based on a permissible construction of the statute, and was an interpretive rule entitled to judicial deference. *Id.* at 1361-64.

On appeal, Silva-Hernandez asserts Section 1 of the CAA is not ambiguous. The statute states, in what is known as the "rollback provision," that "[u]pon approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission for permanent residence as of a date thirty months prior to the filing of such an application or the date of his last arrival into the United States, whichever date is later." Pub. L. No. 89-732, § 1, 80 Stat. 1161, 1161 (as amended) (reproduced as a historical note to 8 U.S.C. § 1255). The very next sentence provides: "The provisions of this Act shall be applicable to the spouse and child of any alien described in this subsection, regardless of their citizenship and place of birth, who are residing with such alien in the United States . . . ." *Id.* Silva-Hernandez asserts our inquiry starts and stops with reading these sentences, as they unambiguously state that Congress intended the rollback

provision be applied to spouses and children of Cuban nationals, no matter their nationality or citizenship. Thus, the Immigration Service's pattern and practice of limiting the date of lawful permanent resident status of a non-Cuban spouse based on the date of the non-Cuban spouse's marriage to the Cuban national violates the plain and unambiguous language of the CAA.

The Immigration Service does not argue that any particular term in the statute is ambiguous or has multiple meanings.[2] Rather, the Immigration Service hinges its argument on its assertion that the plain meaning of the CAA yields absurd results. Specifically, the Immigration Service asserts that Silva-Hernandez's interpretation would accord a non-Cuban spouse benefits to which the non-Cuban spouse is not otherwise entitled—rollback to a date on which the non-Cuban spouse was not qualified for application under the CAA. Further, according to the Immigration Service, the non-Cuban spouse could receive an earlier adjustment date than the Cuban alien upon whom the non-Cuban spouse's application is based.

---

[2] In fact, the Immigration Service devotes only two sentences in its brief to any argument that the statute is ambiguous. The Immigration Service states that "Congressional intent is ambiguous as it relates to whether derivative non-Cuban spouses are entitled to benefits backdated to before the date of the qualifying marriage." It further contends: "CAA Section 1 does not contain explicit language stating that non-Cuban spouses are entitled to benefits arising prior to the date of the qualifying marriage." This is the extent of the Immigration Service's argument that the statute is ambiguous.

## II. LANGUAGE OF STATUTE AND ADJUDICATOR'S FIELD MANUAL

Before we begin our discussion of the issue presented, we must first set out the relevant language of the statute and Adjudicator's Field Manual provision.

### A. *The Statute*

Section 1 of the CAA provides, in pertinent part:

That, notwithstanding the provisions of section 245(c) of the Immigration and Nationality Act, the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least one year, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence. Upon approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission for permanent residence as of a date thirty months prior to the filing of such an application or the date of his last arrival into the United States, whichever date is later. The provisions of this Act shall be applicable to the spouse and child of any alien described in this subsection, regardless of their citizenship and place of birth, who are residing with such alien in the United States, except that such spouse or child who has been battered or subjected to extreme cruelty may adjust to permanent resident status under this Act without demonstrating that he or she is residing with the Cuban spouse or parent in the United States.

Pub. L. No. 89-732, § 1, 80 Stat. 1161, 1161 (as amended) (reproduced as a historical note to 8 U.S.C. § 1255).

7

*B. Immigration Service Adjudicator's Field Manual Section 23.11*

Section 23.11(m)(2) of the Immigration Service Adjudicator's Field Manual

provides:

> The non-Cuban spouse and children of a qualifying Cuban applicant
> are entitled to the same rollback provisions as the principal alien.
> However, their rollback date cannot precede the date of the qualifying
> marriage.  Although this rule has been adopted as a matter of policy,
> it has no basis in statute or regulation.  Rather, it is an application of
> the general principle that a benefit cannot accrue to an alien before
> eligibility exists.

## III.  DISCUSSION

The issue before us is whether the Immigration Service's pattern and

practice, provided for in its Adjudicator's Field Manual, of limiting a non-Cuban

spouse's "rollback date" to the date of marriage, rather than recording a date thirty

months prior to the non-Cuban spouse's filing of the application for adjustment of

status (or the date of the non-Cuban spouse's arrival in the United States,

whichever is later), violates the plain language of the CAA.  We review *de novo*

the district court's grant of summary judgment on this issue.  *Durr v. Shinseki*, 638

F.3d 1342, 1346 (11th Cir. 2011).  We also "review *de novo* questions of statutory

interpretation."  *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1264 (11th Cir. 2011).

8

*A. Plain Meaning of the Statute*

When reviewing an agency's construction of a statute which it administers, we first determine whether Congress has directly spoken to the question at issue. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.

In order to determine whether the intent of Congress is clear, we must employ traditional tools of statutory construction. *See id.* at 843 n.9. "As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). When we construe a statute, "we must begin, and often should end as well, with the language of the statute itself." *Id.* (quotations omitted). This is because "we presume that Congress said what it meant and meant what it said." *Id.* (quotations omitted). "Those who ask courts to give effect to perceived legislative intent by interpreting statutory language contrary to its plain and unambiguous meaning are in effect asking courts to alter that language, and courts have no authority to alter statutory language. . . . We cannot add to the terms of the provision what Congress left out." *CBS Inc. v. Primetime*

9

*24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001) (quotations and alterations omitted).

This case turns on the interpretation of the first three sentences of Section 1 of the CAA. We will analyze each sentence in turn, and as they relate to one another, to determine whether the meaning of the statute is plain and unambiguous.

The first sentence states:

> That, notwithstanding the provisions of section 245(c) of the Immigration and Nationality Act, the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least one year, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.

The language of this sentence is not ambiguous. The Attorney General has discretion to adjust the status of any alien who is a native or citizen of Cuba who has been inspected and admitted or paroled into the United States after January 1, 1959, and has been present in the United States for at least one year, if the alien applies for adjustment *and* the alien is eligible to receive an immigrant visa *and* is admissible to the United States for permanent residence.

10

The next sentence, the "rollback provision," states:

> Upon approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission for permanent residence as of a date thirty months prior to the filing of such an application or the date of his last arrival into the United States, whichever date is later.

Again, the language of this sentence is not ambiguous. Upon the Attorney General's decision to exercise discretion to adjust the native or citizen of Cuba's status to that of a lawful permanent resident, the Attorney General *shall* create a record of the alien's admission as of a date thirty months prior to the filing of the application, or the date of his last arrival into the United States, whichever is later.

Finally, the last sentence states:

> The provisions of this Act shall be applicable to the spouse and child of any alien described in this subsection, regardless of their citizenship and place of birth, who are residing with such alien in the United States, except that such spouse or child who has been battered or subjected to extreme cruelty may adjust to permanent resident status under this Act without demonstrating that he or she is residing with the Cuban spouse or parent in the United States.

This sentence is also not ambiguous. The provisions of the CAA *shall* be applicable to the spouse and child of any alien described in this subsection. The alien described in this subsection is the one who was unambiguously described in the first sentence. Thus, if you are married to, or a child of, the alien described in the first sentence, and you are residing in the United States with the alien

11

described in the first sentence, *see Gonzalez v. McNary*, 980 F.2d 1418, 1420 (11th Cir. 1993), the CAA *shall* be applicable to you, regardless of your citizenship or place of birth. And one of the provisions of the CAA that shall apply is the rollback provision. This is clear from the language and structure of the statute. The third sentence of Section 1 makes the "*provisions*" of the CAA applicable to non-Cuban spouses and children. The rollback provision, which appears in the immediately preceding sentence of Section 1, is clearly a provision of the CAA.

The unambiguous language of Section 1 of the CAA supports that a non-Cuban spouse of a Cuban whose status has been adjusted under the CAA should have a recorded date of lawful permanent residence of thirty months prior to the application date or the date of the non-Cuban spouse's last arrival into the United States, whichever date is later. Importantly, the statute contains no language stating the non-Cuban must be married to the Cuban as of the non-Cuban's rollback date, nor does it state the Cuban and non-Cuban spouse must enter the United States simultaneously. "We cannot add to the terms of the provision what Congress left out." *CBS*, 245 F.3d at 1228 (quotations and alteration omitted).

"Where the language of a statute is unambiguous, as it is here, we need not, and ought not, consider legislative history." *Harry*, 291 F.3d at 772. "The 'plain'

12

in 'plain meaning' requires that we look to the actual language used in a statute, not to the circumstances that gave rise to that language." *CBS*, 245 F.3d at 1224. Our decisions "mandat[e] that ambiguity in statutory language be shown *before* a court delves into legislative history." *Id.* Thus, because we conclude the statute is clear, the parties' arguments regarding the legislative history of the CAA are not relevant to our plain meaning analysis, and we will not address them here.

## B.  Absurd Result

This Court's one recognized exception to the plain meaning rule is absurdity of results. *CBS*, 245 F.3d at 1228. We have observed, "[t]hough venerable, the principle is rarely applied, because the result produced by the plain meaning canon must be truly absurd before this principle trumps it. Otherwise, clearly expressed legislative decisions would be subject to the policy predilections of judges." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1188 (11th Cir. 1997). "[I]t is irrelevant that we may not have made the same policy decision had the matter been ours to decide if we cannot say that it is absurd, ridiculous, or ludicrous for Congress to have decided the matter in the way the plain meaning of the statutory language indicates it did." *CBS*, 245 F.3d at 1228 (quotations and alterations omitted).

13

The Immigration Service attempts to show the absurdity of the plain meaning of the CAA in two ways.  First, it points to the CAA's legislative history; and second, it presents various hypothetical scenarios resulting from the plain meaning in which it contends the theoretical outcomes would be absurd.

The Immigration Service relies on the legislative history indicating that the spousal provision was added to promote "family unity"[3] to show absurd results. *See Gonzalez*, 980 F.2d at 1421 ("The purpose of the [CAA's] provision permitting a spouse and child of a Cuban alien to obtain permanent residence is to promote family unity.").  The legislative history is silent, however, on the issue of the assignment of a rollback date for a non-Cuban spouse who marries a Cuban national after the Cuban national is given permanent resident status.  Despite this silence, the articulated legislative intent of family unity is furthered by giving the earlier rollback date to a non-Cuban spouse, as the non-Cuban spouse could get a

---

[3] *See* H.R. Rep. No. 89-1978, at 5-9 (1966), reprinted in 1966 U.S.C.C.A.N. 3792, 3796-99 (August 4, 1966, letter of Deputy Att'y Gen. Ramsey Clark) (suggesting the CAA's spousal provision was included "[i]n order to maintain the unity of the family . . . to provide for the adjustment of status thereunder of the spouse and children of the Cuban who is the principle beneficiary of this bill, regardless of their nationality and nativity, if they are living with him in the United States"); Adjustment of Status for Cuban Refugees: Hearing on H.R. 15182, H.R. 15183, H.R. 16908, H.R. 10808, and H.R. 13393 Before Subcomm. No. 1 of the H. Comm. on the Judiciary, 89th Cong., 36, 40 (1966) ("I think the Congress took a very strong position in the law last year as to reuniting families." (statement of Nicholas deB. Katzenbach, Att'y Gen. of the United States)), ("I think that this proposition to reunite families is in a humane direction." (statement of Rep. Peter W. Rodino, Jr., Member, Subcomm. No. 1 of the H. Comm. on the Judiciary)).

14

jump start on his or her path to naturalization.  Not only is the plain meaning of the statute not absurd, it arguably furthers the legislative intent of family unity.

The Immigration Service presents several hypothetical scenarios in which a non-Cuban spouse is given "greater" benefits than the Cuban national in order to show the plain meaning of the statute could yield absurd results.  The examples involve the non-Cuban spouse receiving an earlier rollback date than the Cuban national, and a non-Cuban spouse receiving a rollback date preceding the Cuban's presence in the United States, potentially to a date when the Cuban national was married to someone else.  The Immigration Service argues "[t]hese outcomes, resulting from a 'literal reading' of the CAA, would be absurd because the non-Cuban spouse would be receiving benefits of the CAA to which the Cuban spouse would not be accorded."  Further, the literal interpretation "would give no credence to the statutory intent of 'family unity' because non-Cuban spouses would be provided retroactive benefits before a 'family' ever existed."

We are not convinced the Immigration Service's hypothetical scenarios demonstrate absurd results, as the "rollback provision" in the CAA is a special benefit carved out for Cuban nationals.  Congress gave Cubans this special benefit, and giving a non-Cuban spouse (no matter the date of marriage) the same benefit is no more absurd than giving Cubans this special benefit.  If Congress

15

carved out this provision for Cuban nationals, there is no reason why Congress cannot treat the spouse of a Cuban national the same way. Even if a particular application of the rollback formula may lead to an arguably anomalous result (such as granting permanent resident status to a non-Cuban applicant as of an earlier date than the Cuban spouse), we cannot say that Congress could not have intended to apply a uniform rollback formula to all applicants, Cuban and non-Cuban alike. Indeed, there is nothing absurd about using a single rollback formula for all CAA applicants, if only for greater ease of administration.

In light of our "exacting standard" for finding absurdity, we conclude the Immigration Service has not shown that the plain meaning of Section 1 of the CAA would yield "the type of truly absurd or ludicrous results which would permit us to depart from the plain meaning of the statute." *See CBS*, 245 F.3d at 1228-29.

16

## IV. CONCLUSION

As we conclude that the language of the statute is not ambiguous and does not yield absurd results, we have answered the necessary *Chevron* question,[4] whether Congress has directly spoken to the precise question at issue, in the affirmative. The Immigration Service Adjudicator's Field Manual provision providing that a non-Cuban spouse's rollback date cannot precede the date of the qualifying marriage is contrary to the unambiguously expressed intent of Congress. Thus, we reverse the district court and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[4] Because we conclude the statute is not ambiguous and the agency's construction is contrary to Congress's intent, we need not address the parties' arguments regarding the type of deference afforded to the Immigration Service's interpretation of the statute. *See Chevron*, 467 U.S. at 843, 104 S. Ct. 2782.

EVANS, District Judge, dissenting:

I respectfully dissent.  I conclude that a person in Appellant's position (a non-Cuban immigrant married in 2010 to a Cuban immigrant who had obtained an adjustment to resident alien status in 2000) is not entitled to the benefit of the unique rollback provision in Section 1 of the Cuban Refugee Adjustment Act of 1966 ("CAA").[1]  This rollback provision entitles an applicant for adjustment to permanent resident status to have the adjustment recorded as of a date thirty (30) months prior to the application for adjustment of status.  Because a person in permanent resident status must reside in the United States for five (5) years prior to applying for naturalization, 8 U.S.C. § 1427(a), the rollback gives the successful applicant a thirty (30) month head start toward eligibility for naturalization.

The statute on its face demonstrates Appellant Silva-Hernandez does not fall within the class of persons intended to be benefitted.  She was not Mr. Hernandez's spouse when he applied for adjustment of status to permanent resident alien in 2000.  She became his spouse in 2010.  Section 1 of the CAA provides as follows:

> That, notwithstanding the provisions of section 245(c) of the Immigration and Nationality Act, the status of any alien who is a native

---

[1]Even though the title of the Act suggests application to refugees in 1966, the text of the statute makes clear its provisions continue through today.

18

or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least one year, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence. Upon approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission for permanent residence as of a date thirty months prior to the filing of such an application or the date of his last arrival into the United States, whichever date is later. The provisions of this Act shall be applicable to the spouse and child *of any alien described in this subsection*, regardless of their citizenship and place of birth, who are residing with such alien in the United States, except that such spouse or child who has been battered or subjected to extreme cruelty may adjust to permanent resident status under this Act without demonstrating that he or she is residing with the Cuban spouse or parent in the United States.

Pub. L. No. 89-732, § 1, 80 Stat. 1161, 1161 (as amended) (reproduced as a historical note to 8 U.S.C. § 1255) (emphasis added).

I read section 1 as describing a situation in which the Cuban-born spouse is entitled to a record of admission to permanent residence as of a date thirty (30) months prior to the filing of his last application, or the date of his last arrival into the United States, whichever date is later. His spouse[2] is entitled to the same rollback, even though she is not of Cuban birth. The non-Cuban spouse is

---

[2]For simplicity of discussion, it is assumed the husband is the Cuban-born spouse, although the statute makes no such distinction.

19

described in the statute in relation to her husband, the Cuban spouse. This relational aspect of the statute is made clear in the part which says "[t]he provisions of this Act shall be applicable to the spouse . . . of any alien described in this subsection . . . ."[3] The alien "described in this subsection" is the Cuban-born spouse who is applying for permanent resident status, along with his wife.

In my opinion, the majority opinion ignores these key words in its analysis. The majority concedes the first sentence of section 1--which describes the qualified native or citizen of Cuba applying for status adjustment--is "unambiguous." The majority further recognizes that "the alien 'described in this subsection' is the one who was unambiguously described in the first sentence." Where I think the majority's analysis falters is in its failure to recognize that the first sentence of section 1 describes a Cuban-born alien who is eligible to apply for an adjustment to permanent resident status.

The statute assumes the couple is married and that they are moving through the immigration process together. Mr. Hernandez applied for and received his adjustment of status under the CAA in 2000. He was unmarried at the time of his application and at the time of his adjustment to permanent resident status. By the

---

[3]I will refer to this as the "family provision."

20

time Appellant Silva-Hernandez married Mr. Hernandez in 2010 he was already a permanent resident. Therefore, she has never been the spouse of an "alien described in this subsection," because the "alien described in [section 1]," is an alien who has not yet had his status adjusted. In my opinion, then, she cannot be an intended beneficiary of the CAA. Because Silva-Hernandez did not qualify for the thirty (30) month rollback in the CAA, there was no impediment to the Immigration Service's granting her adjustment of status to permanent resident alien only back to the date of her marriage to Mr. Hernandez, in accordance with section 23.11(m)(2) of the Immigration Service Adjudicator's Field Manual.

Moreover, even if the statute is ambiguous, the legislative history of the CAA clearly shows Congress intended the special rollback provision be accorded only to immigrants from Cuba and their spouses at the time of immigration. The legislative history is replete with discussion about the plight of Cuban refugees in the United States in 1966.[4] The overarching purpose of the CAA, repeated often in the legislative history, was to allow Cuban refugees to apply for permanent

[4]*See* H.R. Rep. No. 89-1978, *reprinted in* 1966 U.S.C.C.A.N. 3792; S. Rep. No. 89-1675 (1966); Conf. Rep. No 89-2334 (1966); 112 Cong. Rec. 27962 (1966); 112 Cong. Rec. 28605 (1966); *To Adjust the Immigration Status of Cuban Refugees in the U.S.: Hearing on S. 1241 and S. 3712 Before the Subcomm. on Immigration and Naturalization of the Comm. on the Judiciary*, 89th Cong. 1-57 (1966); *Adjustment of Status for Cuban Refugees: Hearings on H.R. 15182, H.R. 15183, H.R. 16908, H.R. 10808 and H.R. 13393 Before Subcomm. No. 1 of the H. Comm. on the Judiciary*, 89th Cong. 1-73 (1966).

21

residency status without having to leave the United States.  The law as it stood in 1966 was that aliens from countries in the Western Hemisphere could not apply for adjustment of status from within the United States.  *Adjustment of Status for Cuban Refugees: Hearings on H.R. 15182, H.R. 15183, H.R. 16908, H.R. 10808 and H.R. 13393 Before Subcomm. No. 1 of the H. Comm. on the Judiciary*, 89th Cong. 30 (1966) (statement of Nicholas deB. Katzenbach, Att'y Gen. of the United States).  They were required, justified by Congress on the basis of proximity and concerns about fraud, to leave the United States and apply for an immigration visa from a U.S. Consulate in another country.  *Id.*  For most immigrants, this meant simply returning to their home country.  *Id.*  However, after the United States severed diplomatic relations with Cuba in 1961 and closed its consulate there, this option was not available to Cubans living in the United States.  *Id.*  It was possible for Cubans to go to another country, e.g., Canada or Mexico, but the travel was complicated, expensive, and "unreasonably burdensome" on the refugees.  112 Cong. Rec. 28605, 28607 (1966).  In addition, the influx of applicants to these nearby consulates was overwhelming those offices, resulting in significant limitations on the types and number of Cuban applications they would accept.

The legislative history further details the significant disadvantages, both to individual Cubans as well as to the United States' economy, of not permitting

22

Cuban refugees to obtain permanent resident status. These included inability to find sufficient employment, inability to leave the United States to consider resettlement in other countries because re-entry back to the United States was not assured, inability to successfully disperse Cubans throughout the country because of limited employment options, and inability to pursue certain educational opportunities. It is in this context Congress passed the CAA--a narrow law exempting qualifying Cubans from certain immigration rules and permitting them to apply for adjustment of status from within the United States.

This Court has previously acknowledged Congress added the family provision out of concern for "family unity." *Gonzales v. McNary*, 980 F.2d 1418, 1421 (11th Cir. 1993). The family provision was added after Deputy Attorney General Ramsey Clark pointed out there were likely a number of cases where a "citizen of Cuba *may have married* and have his spouse and children living with him in the United States." H.R. Rep. No. 89-1978, *reprinted in* 1966 U.S.C.C.A.N. 3792, 3799 (emphasis added). In order to "*maintain* the unity of the family," Deputy Attorney General Clark recommended language, which Congress included verbatim, making the spouse and children of a qualified Cuban applicant eligible under the CAA's adjustment and rollback provisions, even though they might be non-Cuban themselves. *Id.* (emphasis added).

23

Both of Deputy Attorney General Clark's statements suggest a marriage or family already in existence.  He used the phrase "may have married."  This is in the past tense; he is concerned about adjustment applicants who are already married or who already have children when they apply.  He explains next that some of these family members might not be Cuban themselves and therefore were not eligible for adjustment under the bill as written.  In the very next sentence, Deputy Attorney General Clark suggests changes in order to "maintain" the unity of this family.   "Maintain" is defined as "to keep in an existing state." WEBSTER'S NEW COLLEGIATE DICTIONARY 687 (1979).   Therefore, "maintaining" a family necessarily presupposes it already exists.  His specific use of "maintain," together with the express concern about Cubans who "may have married," is compelling evidence Congress intended the provisions of the CAA would only apply to a non-Cuban spouse who was already married at the time of the Cuban's application for adjustment.

Given the extensively documented concerns about the cumbersome and expensive travel requirements imposed by the existing law on Cuban refugees, as well as the administrative burdens associated with processing hundreds of thousands of Cuban refugees, the legislative purpose and history confirms a reading that the family provision was only ever intended to cover the Cuban's then

24

existing spouse and family.  The family provision streamlined the entire family's immigration application and processing.  Rather than requiring the Cuban spouse to apply for and receive permanent status, and then subsequently requiring his spouse and children to apply as the close relative of an alien with permanent residence status, Congress chose to permit his very immediate family to move through the immigration process with him, and under the same adjustment rules as applied to him.  This group processing served both to "maintain the unity of the family," as well as to promote Congress' expressed desire to relieve the administrative burden caused by the influx of these refugees.

Permitting a later married spouse to apply for adjustment under the CAA--ten years after the Cuban himself has moved through the immigration process and has settled in the United States--furthers neither of these congressional purposes. It is of no additional administrative efficiency to process the non-Cuban spouse's application for adjustment ten years later under the CAA as opposed to under any other applicable status adjustment provisions.  It also strains common sense to argue applying the CAA to Appellant Silva-Hernandez "maintains" any sense of family unity.   The family provision was added, word for word, as requested by Deputy Attorney General Clark.  His explicit reason for adding the family provision was concern for Cubans who might already be married and have

25

children, and to provide for a mechanism to move the entire, existing, family through one status adjustment process.  Applying the provisions of the CAA to Appellant Silva-Hernandez, ten years later, does not serve the clear congressional intent behind the family provision.

Furthermore, other congressional testimony confirms a reading that the future spouse of an unmarried Cuban who has already been adjusted to permanent resident status is not an intended beneficiary of the Act because she is not, and was not ever, the spouse "of any alien described in this subsection."  After the House added the family provision to its version of the bill, Assistant Secretary for Inter-American Affairs, Lincoln Gordon, advocated the Senate also "consider the inclusion of such persons—that is direct family relatives *of the persons directly affected* by the legislation."  *To Adjust the Immigration Status of Cuban Refugees in the U.S.: Hearing on S. 1241 and S. 3712 Before the Subcomm. on Immigration and Naturalization of the Comm. on the Judiciary*, 89th Cong. 21 (1966) (emphasis added).  The Senate committee report released after the provision was added explained the family provision "amend[ed] section 245(c) [of the 1965 Immigration Act] to make eligible for adjustment of status a native or citizen of Cuba and his spouse and children, who have entered the United States *and have not otherwise acquired the status of permanent residence.*"  S. Rep. No. 89-1675,

26

at 6 (1966) (emphasis added).  In neither the statutory text nor the legislative history is the non-Cuban spouse ever identified separately from her Cuban spouse. At all times, the applicability of the CAA to the non-Cuban spouse is in direct relation to the "principal beneficiary" of the law:  the Cuban spouse eligible for and applying for adjustment.  Although the law clearly envisions a non-Cuban spouse as a beneficiary of the law, she is a derivative beneficiary only to the extent of her relationship with the principal, Cuban, beneficiary.  Since the CAA was only applicable to Mr. Hernandez before he received his permanent residency status, and because Appellant Silva-Hernandez was not his spouse at that time, there is no derivative benefit for her to claim ten years later.

Because the text of the statute unambiguously applies the provisions of the Act only to the spouse of the Cuban refugee "described in [Section 1]," because the Cuban refugee "described in [Section 1]" is unambiguously an alien proceeding through the immigration process, and because it is undisputed Appellant Silva-Hernandez was not Mr. Hernandez's spouse until after he was already a permanent resident, I conclude she is not entitled to the benefit of the rollback provision.  Further, even if the statute were unclear on its face, the legislative history indicates the family provision was added to "maintain" family unity during the immigration process, and never to serve as a mechanism for a

27

later-married spouse to move through her own, independent immigration process.

For these reasons, I respectfully dissent.